Richard Akbar
**SALAHUDDIN, Plaintiff,**

v.

**David R. HARRIS, et al., Defendants.**

**No. 83 Civ. 1886 (RWS).**

United States District Court,
S.D. New York.

April 3, 1987.

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff; Michael B. Mukasey, John B. Harris, Siobhan Shanks, Steven A. Zalesin, of counsel.

Robert Abrams, Atty. Gen. of N.Y., for defendants; Judith T. Kramer, Charles R. Fraser, Asst. Attys. Gen., of counsel.

SWEET, District Judge.

This § 1983 case was initiated on January 13, 1983 by *pro se* plaintiff Richard Akbar Salahuddin ("Salahuddin"). Defendants have moved for an order permitting them to amend their answer to assert an affirmative defense based on the statute of limitations, and for summary judgment in their favor dismissing the complaint. Salahuddin, now represented by able counsel, opposes defendants' application to amend their answer, opposes the motion for summary judgment, and has cross-moved for partial summary judgment on his claims that the defendants violated his First Amendment rights. The many difficult issues have been well briefed by counsel for both sides, and argument was heard on November 14, 1986. For the reasons set forth below, the defendants' motion to amend their complaint is granted, and their motion for summary judgment is granted to the extent outlined. Salahuddin's motion for partial summary judgment is also granted.

**Facts**

Richard Akbar Salahuddin ("Salahuddin"), a prisoner of New York State incarcerated at the Green Haven Correctional Facility ("Green Haven"), was the duly elected chairman of the Inmate Liason Committee ("ILC") during parts of 1979 and 1980. The ILC was established by the Green Haven superintendent at the direction of the New York Department of Correctional Services to "faciliate consideration and analysis of suggestions from inmates relative to facility operations." N.Y. Dept. of Correctional Services Direction # 4002 (Jan. 1, 1975) [hereinafter cited as "Directive 4002"]. It operated under a constitution approved by the superintendent.

In early January, 1980, a Muslim inmate named Freddie Padgett ("Padgett") spoke to Salahuddin about a problem that Padgett had had with a female correction officer who he believed had violated his privacy by watching him defecating and observing his genitals, and who had then written him up for violations he thought were unwarranted.[1] Padgett was confined to his cell for eleven days before his hearing on the charges on January 6, 1980.

After conferring with Padgett, Salahuddin wrote a memorandum to Superintendent Harris outlining what Padgett had related to him. After recounting Padgett's story, Salahuddin wrote: "A number of femal [sic] officers have been mis-using their authority concerning the above mentioned matter, and I personally think that your office should curtail this illegal activity. As [the officer's] act concerning the above mentioned inmate was absolutely nothing less than absurd." Salahuddin also related Padgett's allegations that Deputy Superintendent Capuano had presided over a part of his hearing and had conducted himself improperly. Apparently, Capuano had not in fact presided over the hearing in question, but was scheduled to preside over a later proceeding.

Salahuddin's memo asked that charges against Padgett be dropped and that he be released from "keeplock" status. He closed: "Thanking you and your staff in advance for any and all assistances that your office may render to the above just

---

1. A Muslim is prohibited by religious law from revealing his genitals to any member of the opposite sex but his spouse. *See Rivera v. Smith,* 63 N.Y.2d 501, 506, 483 N.Y.S.2d 187, 189, 472 N.E.2d 1015, 1017 (1984).

mentioned matter. Respectfully submitted, /s/Richard Akbar Salahuddin—ILC Chairman." The memo was addressed to Superintendent Harris, and carbon copies were sent to Deputy Superintendents Berry, Keenan, and Capuano. Carbon copies were also sent to Padgett himself and to the "ILC files." Salahuddin had sent previous letters of this sort to Harris, and had received letters of acknowledgment in one instance advising him that the inmates in question would have to appeal themselves, but another time actually advising him that his memo had been forwarded to the committee handling the case.

This time, however, the authorities did not prepare an acknowledgement, but rather drew up the institution's internal equivalent of a summons. Deputy Superintendent Capuano—who says in his affidavit that he was "relatively new at conducting inmate disciplinary proceedings"—directed Officer Michael Egger to prepare a Misbehavior Report, which Capuano signed as a witness.

The section of the Misbehavior Report "Description" read:

1.75–Interference with employees duties, 3.30.1–Abuse of priveleges, [sic] 3.30.12–Lying (False statements or information) On Jan. 9, 1980 a memo was submitted to Supt. D.R. Harris by the above named inmate, acting in the capacity of I.L.C. chairman concerning a disciplinary case against F. Padgett, 78–A–590. In this memo inmate [Salahuddin] stated that a Superintendent's Proceeding was held on Padgett on 1/6/80 by D.S.A. C.B. Capuano. He further stated that Dep. Supt. Capuano held the proceeding illegally and that the officer who submitted the report on Padgett mis-used her authority.

In submitting this memo [Salahuddin] has abused his authority as I.L.C. chairman by using his position to interfere with individual inmates disciplinary cases and the official duties of individual employees. Further, while acting in the capacity of I.L.C. chairman [Salahuddin] submitted a document (the above mentioned memo) which contains false state-

ments in that Dep. Supt. J.P. Keenan held the 1/6/80 hearing on Padgett, not Dept. Supt. Capuano. By submitting this document, which became an official part of Padgett's Superintendent's Proceeding at Padgett's request on 1/12/80. [Salahuddin] interfered with D.S.A. Capuano by placing doubt on the Deputy Superintendent's credibility as hearing officer in Padgetts [sic] case. Dep. Capuano was designated as the hearing officer by Supt. Harris prior to the Deputy Supt's knowledge of [Salahuddin's] memo.

It should also be noted that [Salahuddin] has submitted numerous other memo's to Supt. Harris in the past concerning inmate's disciplinary cases, again while acting as chairman of the I.L.C.

Egger signed the form on the line labelled "Signature of Person Making Report." Capuano himself signed on the line labelled "Endorsement of other employee witnesses (if any)." According to Egger, although most inmate behavior reports are prepared by the actual witness, when a deputy superintendent is the witness, he often delegates the paperwork to an officer in the disciplinary office, even though N.Y.C.R.R. § 251–1.4(b) mandates that a Misbehavior Report be filed by an actual witness.

Egger also filled out a "Notice of Report" which reads "You are hereby advised that I have filed with the Superintendent a Non Confinement Misbehavior Report for violation of Rule(s) 1.75, 3.30.1, 3.30.12." Egger says that although department procedures called for delivery of a copy of the notice of report to prisoners, he does not know whether Salahuddin actually received one. Salahuddin says he received a copy of neither the Notice of Report nor of the Misbehavior Report itself, and learned that he was to have a disciplinary hearing only when told orally by an officer a few hours before he was scheduled to appear on January 15.

On January 15, the disciplinary panel—known officially as the "Adjustment Committee"—convened to consider the charges against Salahuddin. Defendants Royce, Maile and Gibb were the members of the

panel. According to Salahuddin, he asked to call witnesses and to have access to documents that related to the charges against him. The presiding officer Sergeant Royce, although he has sworn that he "was given no training or briefing in how such hearings were to be conducted," has also sworn that department procedures did not allow for inmates to be called, and that the committee was not permitted to deviate from the procedures. Royce does not reveal what the department procedures provided in the way of prisoner access to documents, but says that the "only" document used against Salahuddin was Salahuddin's memo of January 9. Royce mentions neither the Misbehavior Report itself, nor Salahuddin's "numerous other memo's" [sic] which are incorporated in the Misbehavior Report by reference.

According to Royce at the hearing itself it "is entirely possible that I attempted to dispose of the matter" by getting Salahuddin "to agree not to distribute memoranda concerning inmate disciplinary proceedings in the future." According to Maile, that is exactly what happened: "Sergeant Royce gave [Salahuddin] the opportunity to promise to discontinue his practice of circulating memoranda about pending disciplinary proceedings, in exchange for dropping the charges. [Salahuddin] refused that offer, however." The proceedings of Salahuddin's hearing were not recorded. In any event, the Adjustment Committee found against Salahuddin, confined him to his cell for seven days, and cancelled his recreation privileges for fifteen days.

During the seven days that Salahuddin was confined to his cell, inmates came by to ask what he was being punished for, and some were told of the Padgett memo and Salahuddin's hearing. The entire situation was discussed in an ILC meeting on January 17 (two days after Salahuddin's hearing), at which Superintendent Harris was present. Salahuddin had been granted special permission to attend that meeting notwithstanding his "keeplock" status.

On January 13, 1983, Salahuddin's complaint and motion to proceed *in forma pauperis* were received by the court. His ap-plication to proceed *in forma pauperis* was granted on March 10, 1983, and the complaint was filed on that day.

**Motion to Amend**

 On a motion for leave to amend, "the court need not finally determine the merits of a proposed claim or defense, but merely satisfy itself that it is colorable and not frivolous." *Sumitomo Electric Research Triangle, Inc. v. Corning Glass Works*, 109 F.R.D. 627 (S.D.N.Y.1986). This proposed amendment is not frivolous, Salahuddin will suffer no undue prejudice through it, and it will consequently be allowed.

**Statute of Limitations**

Before 1985, federal courts considering actions under 42 U.S.C. § 1983 were directed to apply the most analogous state statute of limitations, creating substantial uncertainty and divergence among the courts. In 1985, the Supreme Court clarified this issue in *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), holding that a federal court considering civil rights actions brought under 42 U.S.C. § 1983 must borrow the single state limitations period applicable to tort actions for the recovery of damages for personal injury. 471 U.S. at 275–280, 105 S.Ct. at 1949. The Court stressed the breadth and diversity of claims under § 1983 and noted the "numerous and diverse topics and subtopics" it now encompasses, ranging from bans on lawyer advertising and mandatory maternity leave policies to mistreatment of school children and loyalty oath requirements. *Id.* at 273 & n. 31, 105 S.Ct. at 1946 & n. 31. This vast array of actions under the § 1983 umbrella and the wide range of different limitations periods courts had chosen to apply, prompted the Court to direct the selection in each state of "the one most appropriate statute of limitations for all § 1983 claims." *Id.* at 275, 105 S.Ct. at 1947.

The mandate to apply a broad "personal injury" statute of limitations creates some difficulty in states such as New York, where a different statute of limitations exists for some intentional torts (one year

under CPLR 215(3)), and unintentional torts (three years under CPLR 214(5)). The defendants urge that the one-year limitation should apply, and Salahuddin is urging the three-year limitation.

■ A comparison of the two New York statutes at issue suggests that the three-year statute under CPLR § 214(5) governs. That provision broadly covers all "personal injury" torts except those causes of action specifically enumerated in § 215. Section 215(3) is limited to particular specific intentional torts including "assault, battery, false imprisonment, malicious prosecution, libel, slander, false words ... or a violation of the right of privacy." Section 1983 actions are not limited to instances of intentional torts, but include, for instance, gross negligence cases. *See Villante v. Department of Corrections,* 786 F.2d 516, 519 (2d Cir.1985); *Doe v. Department of Social Services,* 649 F.2d 134, 143–44 (2d Cir. 1981). It is not clear whether this Circuit recognizes § 1983 suits based on simple negligence. *Doe,* 649 F.2d at 143 n. 3. The *Wilson* court's command is that the statute for "general personal injury actions" should be applied. 471 U.S. at 279, 105 S.Ct. at 1949. In New York, that statute is CPLR § 214(5).

In addition, courts in this Circuit have rejected arguments that the one-year statute of § 215 should be applied in § 1983 actions. Without reaching the issue directly,[2] in *Villante v. Department of Corrections,* 786 F.2d 516, 520 (2d Cir.1986), the Second Circuit noted: "the *general* personal injury tort limitations, which seems to be

what is mandated for § 1983 actions by *Wilson v. Garcia,* is also three years in New York. N.Y.Civ.Prac.Law § 214, subd. 5." (emphasis in original). Numerous district courts within the Second Circuit have held that the three-year statute applies. *See e.g., Rodriguez v. Chandler,* 641 F.Supp. 1292, 1297 (Weinfeld, J.); *Saunders v. New York,* 629 F.Supp. 1067 (N.D. N.Y.1986) (Munson, C.J.); *Okure v. Owens,* 625 F.Supp. 1568 (N.D.N.Y.1986) (McCurn, J.); *Testa v. Gallagher,* 621 F.Supp. 476, 479 (S.D.N.Y.1985) (Conner, J.); *Williams v. Allen,* 616 F.Supp. 653, 655 (E.D.N.Y. 1985) (Glasser, J.): *Ladson v. New York City Police Department,* 614 F.Supp. 878, 879 (S.D.N.Y.1985) (Sweet, J.); *Rodrigues v. Village of Larchmont,* 608 F.Supp. 467, 477 (S.D.N.Y.1985) (Edelstein, J.)

■ The defendants also argue that Salahuddin's claim is time-barred even under a three-year statute of limitations. In essence, they argue that when the court borrows a state statute of limitations in a federal action, it must also borrow state rules that establish when an action has been commenced for the purpose of that statute of limitations. While the federal rules provide that a "civil action is commenced by filing a complaint with the court," Fed.R.Civ.P. 3, under New York law the action does not commence for the purpose of the statute of limitations until the summons is served on the defendant, N.Y.C.P.L.R. § 203(b)(1). Salahuddin filed the complaint in federal court just before the three years ran,[3] but did not serve the defendants until after it ran.

---

2. The issue is before the Second Circuit by appeal from *Okure v. Owens,* 625 F.Supp. 1568 (N.D.N.Y.1986), which was argued in the Court of Appeals in September, 1986, and is still *sub judice.*

3. Salahuddin's cause of action accrued on January 15, 1980, when disciplinary proceedings were conducted against him, and, as discussed, the applicable statute of limitations allowed him three years from then in which to commence his action. He did so by delivering the complaint and a motion for leave to proceed *in forma pauperis* ("IFP") to this court on January 13, 1983. Where a plaintiff "acts pro se and sends his complaint to the court, and the complaint is not filed until a later date due to

consideration of plaintiff's application to proceed *in forma pauperis,* the action is deemed commenced for purposes of the statute of limitations upon receipt by the court of plaintiff's complaint, and not when it is filed." *Salahuddin v. Milligan,* 592 F.Supp. 660, 661 (S.D.N.Y. 1984), *aff'd without op.,* 767 F.2d 908 (2d Cir. 1985); *see also Rosenberg v. Martin,* 478 F.2d 520, 522 n. 1a (2d Cir.) (Friendly, J.), *cert. denied,* 414 U.S. 872, 94 S.Ct. 102, 38 L.Ed.2d 90 (1973); *Nielsen v. Flower Hospital,* 639 F.Supp. 738, 740 (S.D.N.Y.1986); *Allah v. Commissioner of Correctional Services,* 448 F.Supp. 1123, 1127 (N.D.N.Y.1978).

There is apparently some question as to whether delivering a complaint and an IFP application to the court constitutes a "filing," or

Forty years ago in *Bomar v. Keyes*, 162 F.2d 136, 140–41 (2d Cir.1947), Judge Learned Hand, writing for a unanimous Second Circuit panel, held that filing a complaint pursuant to Fed.R.Civ.P. 3 commences an action for the purposes of a § 1983 action, not the procedures established in the New York CPLR. The defendants argue that *Bomar* has been overruled by subsequent Supreme Court decisions which have applied state rules about the commencement of actions in diversity cases. *See, e.g., Walker v. Armco Steel Corp.*, 446 U.S. 740, 751, 100 S.Ct. 1978, 1985, 64 L.Ed.2d 659 (1980); *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 533–34, 69 S.Ct. 1233, 1234–35, 93 L.Ed. 1520 (1949). *Cf. Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975) (state tolling rules to apply in determining whether state statute of limitations has run).

■ However, *Walker*, the most recent of these diversity cases, explicitly declined to extend its holding to actions based on federal, rather than state, law—as this action is. *See* 446 U.S. at 751 n. 11, 100 S.Ct. at 1985 n. 11. Instead, the *Walker* opinion noted that *Ragan* had "suggested" that Rule 3 does indeed control the question of when an action commences for the purposes of the statute of limitations in an action based on federal law, and noted that *Ragan* had explicitly distinguished its holding from the Second Circuit's holding in *Bowmar*. *Id.* (citing *Ragan*, 337 U.S. at 533, 69 S.Ct. at 1234). So far, the Supreme Court has carefully declined to overrule *Bowmar*, and, consequently, *Bowmar* is still the law in this Circuit. At least one other judge in this court has reached the same conclusion. After a thorough examination of the cases, the Honorable Pierre N. Leval in *Cohen v. Board of Ed. of East Ramapo Central School*, 536 F.Supp. 486, 495 (S.D.N.Y.1982), held: "[I]t is apparent that the Supreme Court has not overruled *Bomar v. Keyes* and has given no indication that it would...." Just as this court has, Judge Leval found "the rule of *Bomar v. Keyes* is controlling." *Id.* Salahuddin's claim is, therefore, not time-barred.

## Due Process

■ The defendants have moved for summary judgment on Salahuddin's due process claims on the grounds that it was not clearly established in 1980 that the procedures outlined in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), applied to Adjustment Committee hearings. Unless a constitutional right is "clearly established" a state official's qualified immunity shields him from liability for violating it. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

In support of the proposition that it was *not* established in 1980 that *Wolff* applied to Adjustment Committee hearings, the defendants point to the New York Court of Appeals case, *Amato v. Ward*, 41 N.Y.2d 469, 393 N.Y.S.2d 934, 362 N.E.2d 566 (1977). In *Amato*, the Court of Appeals wrote:

Whenever a report of misbehavior is made out, an adjustment committee, made up of three employees, investigates the alleged infraction (7 NYCRR 252.-1[b], 252.2[a]). The adjustment commit-

---

instead acts to equitably toll the statute of limitations while the court considers whether or not to grant the plaintiff IFP status. *See Nielsen v. Flower Hospital*, 639 F.Supp. 738, 740 n. 3 (S.D. N.Y.1986) (collecting cases). In another case, this issue might be of some moment because *Board of Regents v. Tomanio*, 446 U.S. 478, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980), directs federal courts to apply state tolling rules in civil rights cases when the state rules are not "inconsistent" with federal law. In this case, however, defendants have not argued that Salahuddin failed to file within three years, but that he failed to *serve* within three years, which under New York law would mean that he failed to commence his action within the statute of limitations. The issue having been neither raised nor briefed, the court consequently will not decide whether delivery of a complaint and an IFP application files the action or merely tolls the statute of limitations; whether such tolling (if that is what it is) is provided for by New York law; or whether the absence of such a tolling provision would be inconsistent with federal law. It does seem, however, that an absence of a tolling provision might well be inconsistent with the purpose of IFP statute, 28 U.S.C. § 1915, the civil rights statute, 18 U.S.C. § 1983, or both.

tee "shall endeavor to obtain from the inmate as full and complete an explanation of his behavior in the situation as possible" (7 NYCRR 252.3[e] ). Then, the committee may either recommend that no action be taken, or require counseling or imposition of relatively minor sanctions to improve the inmate's behavior (7 NYCRR 252.4, 252.5). The committee may make no formal findings as to whether any violations have occurred (7 NYCRR 252.4[b][3] ). Since no sanction more severe than the loss of minor privileges can result from adjustment committee action, strict full due process standards need not be met in these informal proceedings (*see Wolff v. McDonnell*, 418 U.S. 539, 571–572, n. 19, 94 S.Ct. 2963, 2982, n. 19, 41 L.Ed.2d 935 …).

*Id.* at 41 N.Y.2d at 472–73, 393 N.Y.S.2d at 937, 362 N.E.2d at 569. Thus, the New York Court of Appeals, in accordance with its obligation to. interpret faithfully the Constitution of the United States, examined the procedures of Adjustment Committees in New York prisons and determined that they need not comport with the full panoply of safeguards in *Wolff*.[4] *See also In re Flaherty*, 72 A.D.2d 861, 421 N.Y.S.2d 736, 737–38 (1979) (Adjustment Committee procedures satisfy due process).

Salahuddin, on the other hand, has cited a pre–1980 Second Circuit case that stands for the proposition that the procedural protections set forth in *Wolff* did apply to Adjustment Committee hearings. In 1977, the Court of Appeals for the Second Circuit held that full *Wolff* procedural protections had to be employed in any Adjustment Committee proceeding that could result in the imposition of up to fourteen days of keeplock. *McKinnon v. Patterson*, 568 F.2d 930, 938–39 (2d Cir.1977), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792

(1978). The defendants concede that in January, 1980, the Adjustment Committee had the power to impose up to 14 days keeplock as punishment.

The highest court in New York State had ruled one way on the constitutionally required procedures at Adjustment Committee hearings, and the Second Circuit had ruled the other way. The philosophy behind the *Harlow* "clearly established" right rule is that local officials should not be required to hazard their own guesses about the development of constitutional doctrines. 457 U.S. at 818, 102 S.Ct. at 2738. If this is what drives the "clearly established" rule, then it seems patently unfair to hold New York prison guards liable for adopting the views of New York's highest court with respect to the constitutionality of adjustment committee procedures.

Salahuddin's reliance on *McCann v. Coughlin*, 698 F.2d 112 (2d Cir.1983), is not to the contrary. Addressing the issue of qualified immunity, *McCann* held that in 1979 it *was* clearly established that *Wolff* protections applied to Adjustment Committee hearings. *Id.* at 124–25. However, *McCann* addresses the "clearly established" issue solely in terms of federal case law, and concludes, on the basis of only those cases, that the law was established. The issue here is different because the cloudiness in the doctrine is attributed not to uncertainty in the federal cases, but to a direct doctrinal contradiction by the highest state court, operating under an equal duty of fealty to the federal Constitution. To call a right "clearly established" when a Circuit and the highest court of a state within that Circuit disagree (and the Supreme Court has not yet spoken) would seem a serious challenge to fundamental principles of federalism. Therefore, the

---

**4.** Salahuddin has characterized the Court of Appeals' language about adjustment committees as *dicta*. In *Amato* the Court's specific holding was that New York Time Allowance Committees, which award good-time to inmates on the basis of their institutional records, are not disciplinary committees and consequently do not fall under the *Wolff* strictures. But because Time Allowance Committees act on the basis of findings by disciplinary committees—including Adjustment Committees—the court examined the constitutionality of the disciplinary procedures in order to establish the propriety of the Time Allowance Committee's relying on their findings. Consequently, the Court's finding that Adjustment Committee procedures were constitutional was an essential component of its holding that Time Award Committee procedures comport with due process.

claims against the defendants are dismissed on the grounds of qualified immunity insofar as they are predicated on failure to adhere to the procedures in *Wolff.*

**First Amendment**

As the Supreme Court put it over a decade ago, "there is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974). Quite the contrary, the Court has "insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Judson v. Palmer,* 468 US. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984).

In 1974, well before the incidents at issue here, the Court specifically held that among the rights "retained" are: "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system...." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). In analyzing the extent of the penological objectives at issue, courts have been admonished to accord great deference to those charged with running the institutions, particularly when, as here, state penal institutions are involved and thus federalism concerns are implicated. *Jones v. North Carolina Prisoners' Union,* 433 U.S. 119, 126, 97 S.Ct. 2532, 2538, 53 L.Ed.2d 629 (1977). In this case, as in *Prisoners' Union,* the penological interest that the defendants have identified is the security and order of the prison population. The defendants point out that the test which the court must consequently apply is whether there is "substantial evidence in the record to indicate that the officials have exaggerated their response." *Id.* (quoting *Pell v. Procunier,* 417 U.S. at 827, 94 S.Ct. at 2806).

Given the Supreme Court's federalism concerns, *Prisoners' Union,* 433 U.S. at 126, 97 S.Ct. at 2538; *Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807, what New York State and its regulatory agencies have to say on the importance of its own penological goals with respect to the First Amendment warrants careful scrutiny. Effective since 1975, New York Corrections Law has provided:

Inmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution.

N.Y.Correct.Law § 138(4) (McKinney Supp. 1987). Although not dispositive, the section suggests that New York views the broad exercise of inmates' First Amendment rights as consistent with its own penological interests and the order and security of the inmate population.

Similarly, the New York Department of Correctional Services evidenced a clear desire to elicit inmate input when it commanded in Directive 4002 that each facility set up an ILC to "advis[e] institutional officials on matters concerning the general welfare of the inmate population." Although Directive 4002 makes it clear that individual inmates' problems are not to be "discussed at committee meetings," Directive 4002(B)(1)(b), the prohibition is silent on the subject of written applications.

Likewise, the Constitution of the Inmates' Liason Committee that was specifically approved for the Green Haven chapter (and which was approved by the Green Haven Superintendent in compliance with Directive 4002) provides: "the committee is limited to discussing and advising institutional officials on matters concerning the general welfare of the inmate population." Green Haven ILC Constitution Art. 2. Arguably, the topic of female officers intruding on the privacy and religious laws of Muslim inmates—even as illustrated by Padgett's as a specific example—falls within this narrow jurisdiction. Perhaps more important, the Executive Committee (of which Salahuddin was a member by dint of being ILC Chairman) is empowered to "meet with the Superintendent ... to discuss *all problems and proposals.*" Green

Haven ILC Constitution Art. 3(b) (emphasis added).

Perhaps the prohibition on discussing specific inmates' problems at general meetings could be construed broadly to prohibit written memoranda to the superintendent also. However, the evidence on this record is that the Green Haven authorities had not adopted such an interpretation. As ILC Chairman, Salahuddin had sent similar memos to the Superintendent "dozens" of times, and never before had he been punished for it or even warned that it was inappropriate. Quite the contrary, some of Salahuddin's previous memos had been courteously acknowledged, and at least one had been referred to the disciplinary body that was considering the case about which Salahuddin had written.

■ In sum, measuring the state's penological interests by its statutes, the Department of Corrections' own regulations, the ILC Constitution approved by the superintendent of Green Haven, and most particularly, the past practices of the Green Haven prison personnel, Salahuddin's speech was compatible with New York's penological objectives at the time of the communication. Obviously the authorities could alter their practices and thereby the interpretation of the ILC Constitution. Indeed, there is evidence that such was one purpose of the proceeding—to get Salahuddin to accept this prohibition on communications about individual cases.

Further, the record contains evidence "that the officials have exaggerated their response." *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806. For instance, Deputy Superintendent Capuano, the prison official who initiated the charges against Salahuddin, concedes that he was "new" to the world of inmate disciplinary proceedings, which lends credence to the proposition that his response might have been exaggerated because of his inexperience. Perhaps, more important, the affidavits that Capuano has submitted to explain why he initiated the charges are false on at least one count. Capuano says that the decision to initiate charges against Salahuddin was motivated in part by Salahuddin's discussion of his memo at an ILC meeting. However, Capuano signed the Misbehavior Report on January 13; Salahuddin's hearing was January 15; the ILC did not discuss Salahuddin's memo until January 17, and did so then because Salahuddin had been disciplined for writing it. This after-the-fact rationalization tends to supports the conclusion that "the officials exaggerated their response." *Pell,* 417 U.S. at 827, 94 S.Ct. at 2806.

In addition, Sergeant Royce himself concedes that Salahuddin's memo to the Superintendent "was not an immediate threat to security." Defendants have adduced no evidence that it was a danger, or that any inmate but Padgett had ever laid eyes on the memo before Salahuddin was disciplined or reviewed the memo in the ILC files (either before or after the Salahuddin punishment), or that Salahuddin's previous memos to the Superintendent constituted a threat, or that conditions at the prison were somehow unusually tense so that Salahuddin's memo might be uniquely threatening at that particular time.

What the defendants do offer to show that their response was measured is Deputy Superintendent Capuano's statement that Salahuddin's memo to Harris "placed me on the defensive and compromised my neutrality" in future proceedings, and Sergeant Royce's opinion that such a memo to the Superintendent "can lead to general 'sit-downs,' refusals of inmates to attend programs, inmate strikes, or other forms of general threats to order and security." The summary judgment test is whether these statements create "a sufficient disagreement" on the issue of exaggerated response so that a factfinder could resolve the question either way, or "whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby,* —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). One of the prime purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* —— U.S. ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Deputy Superintendent Capuano's fear that his "neutrality" is jeopardized by Salahuddin's memo to Superintendent Harris—not a particularly compelling fear ever under the best of circumstances—simply cannot be credited in the absence of evidence that anyone saw the memo but the Superintendent, other Deputy-Superintendents, and the one inmate who knew that Salahuddin had made a factual mistake in saying that Capuano had presided over the hearing.[5] The same is true of Royce's opinion.

Given the latitude that New York's penological goals afford inmate speech, the only conclusion that a reasonable factfinder could reach on the evidence now before the court is that the response was exaggerated, and consequently on this issue Salahuddin "must prevail as a matter of law." *Liberty Lobby*, 106 S.Ct. at 2512. However, as Salahuddin concedes, still at issue is precisely who was involved in violating his rights.

 Finally, defendants argue that the First Amendment right of a prisoner to submit a memorandum to prison officials was not clearly established at the time Salahuddin was punished. The law in 1980, as today, clearly established that the exercise of First Amendment rights should be respected when "not fundamentally inconsistent" with the legitimate penological interest in deterrence, rehabilitation or security. *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984); *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974); *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). From New York's statutes to Green Haven's practices, the indications are that the right existed and was exercised. Its violation can, therefore, be deemed a contravention of clearly established law, and, consequently, the defendants' acts are not shielded by their qualified immunity.

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment is granted with respect to the claims predicated on failure to adhere to *Wolff* procedures. Salahuddin's cross-motion for partial summary judgment is granted with respect to the First Amendment claims.

Any further discovery will be completed by June 10, 1987, and the pretrial order filed on June 17, 1987.

IT IS SO ORDERED.

---

5. The evidence shows that later inmate discussions of Salahuddin's memo occurred *after* Salahuddin was punished, and were, in fact, triggered not by the contents of the memo but by Salahuddin's punishment for writing it.