Richard Akbar
SALAHUDDIN, Plaintiff,

v.

David R. HARRIS, Thomas Maile, Clement B. Capuano, Michael R. Egger, Fred Royce and Neil Gibb, Defendants.

No. 83 Civ. 1886 (RWS).

United States District Court,
S.D. New York.

April 27, 1988.

Patterson, Belknap, Webb & Tyler, New York City, for plaintiff; Gregory L. Diskant, John B. Harris, Norman I. Silber, of counsel.

Robert Abrams, Atty. Gen. of State of N.Y., New York City, for defendants other than Neil Gibb; Charles R. Fraser, Darren O'Connor, Asst. Attys. Gen., of counsel.

## OPINION

SWEET, District Judge.

Defendants David Harris ("Harris"), Michael Egger ("Egger"), Clement Capuano ("Capuano"), Fred Royce ("Royce"), and Thomas Maile ("Maile") (collectively the "defendants") have moved for summary judgment pursuant to Rule 56, Fed.R. Civ.P., and have moved for an order directing that any trial be conducted by the court without a jury. Plaintiff Richard Akbar Salahuddin ("Salahuddin") has cross moved for a trial by jury, as well for the imposition of sanctions. For the reasons set forth below, defendants' motion for summary judgment is granted in behalf of Egger and denied in all other respects, and their motion for a bench trial is granted. Plaintiff's motion for trial by jury is denied and his motion for sanctions is denied.

*Facts and Prior Proceedings*

The facts of this case are set forth in detail in this court's April 3, 1987 opinion, familiarity with which is assumed. *Salahuddin v. Harris,* 657 F.Supp. 369 (S.D.N. Y.1987). Only a brief recitation of the facts and prior proceedings is warranted here.

At all relevant times, Salahuddin was an inmate in the custody of the New York State Department of Correction. As chair of the Inmates Liaison Committee ("ILC"), a statutorily mandated liaison group between inmates and corrections officials for the purpose of advising the officials on matters concerning the general welfare of the prison population, Salahuddin wrote a memorandum voicing his opposition to the disciplinary treatment received by Freddy Padgett, a fellow inmate.[1] The memorandum was addressed to Superintendent Harris, and carbon copies were sent to Deputies Berry, Keenan and Capuano, and to Padgett, and the ILC files.

As a result of this memorandum, disciplinary charges were filed against Salahuddin by Egger at Capuano's direction. After a hearing, of which Salahuddin had little notice and no opportunity to present witnesses, the Adjustment Committee found against him, confined him to his cell for seven days, and cancelled his recreation privileges for fifteen days. Salahuddin had sent previous letters of a similar nature to Harris but had never before received such treatment. Thus, on March 10, 1983, Salahuddin filed a 42 U.S.C. § 1983 action against the defendants.

---

1. Padgett, had been written up for violations by a female corrections officer whom he believed had violated his privacy by observing his genitals as he was defecating. Padgett was a member of the Muslim religion, in which a person is forbidden by religious law from revealing his genitals to any member of the opposite sex but his spouse.

Salahuddin proceeded *pro se* until August of 1985, at which time counsel was appointed to represent him in appellate proceedings. During the time he proceeded *pro se*, Salahuddin made no jury demand, although all pleadings had been served. Counsel appeared before this court in April of 1986. Counsel formally accepted this court's appointment to represent Salahuddin by letter soon thereafter, and this court so ordered that acceptance on May 9, 1986. However, counsel took no action to demand a jury until October of 1987, over one year after having been appointed.

On April 3, 1987, this court granted defendants' motion to dismiss Salahuddin's due process claim and to amend their answer and granted Salahuddin's motion for partial summary judgment for violation of his First Amendment rights. Pursuant to stipulation, Salahuddin on October 7, 1987 filed an amended complaint containing a jury demand for the first time.

Defendants now renew their motion for summary judgment on Salahuddin's First Amendment claim and on the basis of governmental immunity in light of two recently decided Supreme Court cases and based on allegedly newly discovered evidence. Additionally, they seek summary judgment on Salahuddin's claim for punitive damages, and defendants Harris and Egger seek summary judgment because they were not personally involved in the events underlying the action. Defendants also seek to strike the jury demand.

*First Amendment*

■ The defendants, in large part, base their new attack on Salahuddin's First Amendment claim on the recently decided case of *Turner v. Safley,* — U.S. —, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). In *Turner,* the Court upheld a Missouri Division of Corrections regulation limiting correspondence between inmates at different institutions. In doing so, the Court set forth four relevant factors to be considered in determining whether a regulation is "reasonably related to legitimate penological interests." *Id.* at 2261. They are as follows:

First, there must be a "valid, rational connection" between the prison regulation an the legitimate governmental interest put forward to justify it. *Block v. Rutherford,* 468 U.S. [576,] 586 [104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)]. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. . . .

A second factor relevant in determining the reasonableness of a prison restriction as *Pell [v. Procunier,* 417 U.S. 817 [94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)] shows, is whether there are alternative means of exercising the right that remain open to prison inmates. . . .

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. . . .

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. . . . By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns.

*Id.* at 2262.

The Court held that the regulation banning inmate-to-inmate correspondence was reasonably related to legitimate goals under this four part test. First, they found that there was a growing problem of prison gangs and that the gangs were fostered through communications from prison to prison. Thus, limiting such correspondence was rationally connected to the goal of doing away with gang problems.

Second, the Court found that this restriction did not bar all means of expression, but merely barred communication with a specific class of individuals.

Third the Court found that the impact exercise of the right to communicate with other inmates would have on others within the prison system was great. Because prison gangs threatened the "core functions of prison administration, maintaining safety and internal security," allowing the

exercise of the right would impact on administrators, guards, and other inmates alike.

Finally, the Court determined that there were no alternatives to this regulation in that the only other option would be monitoring communications at a substantial cost to the system. Thus, in all, the Court determined that the regulation was reasonably related to a legitimate penological interest.

The defendants contend that the situation in this case is analogous and thus that this court should reconsider its earlier decision. However, the circumstances in the two cases differ substantially.

To satisfy the first branch of the test, defendants claim that this type of memorandum might generate inmate unrest in the form of strikes or sit-downs thus threatening security. They further claim that such a memorandum might have undermined neutrality of Capuano, the hearing officer. They thus claim that warding off these threats is warranted.

However, neither of these problems merit punishment of the nature Salahuddin received. First, there is no reason why memoranda about individual cases would generate more unrest than memoranda about the general grievances the ILC is statutorily empowered to voice. Moreover, the effect, if any, on Capuano's neutrality is a minor threat and in any event was addressed in this court's April 3, 1987 opinion.

Defendants further suggest that the fact that no one actually saw the memo is irrelevant as *Turner* holds that one need not prove that the correspondence in question actually led to security breaches to find a logical connection between the regulation and security concerns. However, other considerations present here are that Sergeant Royce himself stated that the memo was not a threat, that there was no evidence that conditions in the prison were conducive to unrest from a memo of this sort, and that none of the other similar

memos produced by Salahuddin caused any problems in the past.

The defendants assert that prison personnel will be adversely impacted by Salahuddin's memo in that here, as in *Turner*, such memos are likely to foster the growth of informal prison groups. However, by writing the memo in his capacity as ILC chair, Salahuddin was functioning within the confines of a formal group that has been set up and supervised by prison officials. In *Turner*, monitoring individual correspondence would have been prohibitively expensive. Here, however, the ILC is already monitored.

*Turner* is also distinguishable from this case in further respects. There, a prospective ban on content-neutral communications was logically related to potential scheming between inmates. Here, there can be no scheming; the communications are monitored. Here, the ban is not content-neutral but content-based. Finally here, the ban is not prospective but retroactive, in that Salahuddin had submitted previous memos for which no retribution was meted out.

In sum, the punishment Salahuddin received was an exaggerated response to his actions.[2] The defendants' motion to reconsider this court's grant of summary judgment on Salahuddin's First Amendment claim is therefore denied.

### Qualified Immunity

██ In their November, 1986 motions, the defendants asserted that the First Amendment rights of prisoners were not clearly established at the time Salahuddin acted and thus that they should be shielded by their qualified immunity. This court disagreed and in its April 3, 1987 opinion stated that this right, " 'not fundamentally inconsistent' with the legitimate penological interest in deterrence, rehabilitation or security," indeed "existed and was exercised." 657 F.Supp. at 378 (quoting *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984)).

Defendants now argue that the court should reconsider in light of the recently

---

**2.** This would be true whether or not Capuano acted before or after the ILC meeting at which the incident was discussed since the action was

in response to the memo in any event—the timing of the meeting being the alleged newly discovered evidence.

decided case of *Anderson v. Creighton,* — U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). However, in *Creighton,* the Supreme Court stated that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right" in applying the good faith exception of warrantless searches and seizures to damage actions. *Id.* at 3039.

However, Fourth Amendment jurisprudence has evolved substantially in recent years such that an officer "could, as a matter of law, reasonably have believed that [the warrantless] search ... was lawful." *Id.* at 3040. No such state of flux can be or has been asserted regarding a prisoner's First Amendment rights as of the time Salahuddin wrote the offending memo and was punished. Therefore, this court's earlier determination that Salahuddin was penalized for exercising his clearly established rights will not be reconsidered.

*Punitive Damages*

■ Defendants next claim that punitive damages are unavailable in this case because Salahuddin has failed to show evil motive or intent, or reckless or callous indifference to Salahuddin's First Amendment rights. *See Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983); *see also Carey v. Piphus,* 435 U.S. 247, 257 n. 11, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (punitive damages may be awarded in § 1983 cases "with the specific purpose of deterring or punishing violations of constitutional rights" or "when there is a malicious intention to deprive [plaintiff] of [his] rights").

However, Salahuddin has asserted that the defendants deliberately deprived him of his rights. Whether or not this can be proven is a question for the trier of fact, and thus summary judgment on this point will not be granted.

*Liability of Harris and Egger*

Defendants next claim that Harris and Egger are not liable because they lack personal responsibility in the matter, Harris because he was only the supervisor and did not take part in the disciplinary procedures

and Egger because he merely did the clerical work on the case against Salahuddin.

This circuit directly addressed the questions at issue here in *Williams v. Smith,* 781 F.2d 319 (2d Cir.1986). There, the court held that a defendant was personally liable if he (1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation through a report or appeal; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* at 323–24.

■ Whether or not Harris falls under one of these catagories is a question of fact. Since the memos written by Salahuddin were addressed to him and since he presumably was in charge of prison disciplinary procedures, a reasonable trier of fact might find him responsible for the treatment Salahuddin received. This is not a case of random violence against a prisoner.

■ Egger, on the other hand, is alleged only to have filled out the disciplinary report at Capuano's direction. This is exactly the lack of personal involvement addressed by *Williams.* Therefore, summary judgment will be granted dismissing the case against Egger.

*Jury Trial*

■ Under Rule 38(b), Fed.R.Civ.P., a jury demand must be made not later than ten days after the last pleading is served. If the demand is not made, the right to jury is waived. Rule 38(d), Fed.R.Civ.P. An amended complaint will only give rise to a new period within which to demand a jury if new issues are presented in the amendment, and then the demand may only pertain to trial of those issues. *See e.g., Bank of India v. Handloom House (India) Ltd.,* 629 F.Supp. 281 (S.D.N.Y.1986).

■ Although an untimely jury demand may be granted if the failure to make the demand was due to excusable neglect, inadvertence is inexcusable. *Noonan v. Cu-*

nard Steamship Co., 375 F.2d 69 (2d Cir. 1967); *Alvarado v. Santana–Lopez,* 101 F.R.D. 367 (S.D.N.Y.1984). This is true even if the plaintiff is a prisoner proceeding *pro se. Hilliard v. Scully,* 537 F.Supp. 1084, 1091 (S.D.N.Y.1982).

■ Here, Salahuddin proceeded *pro se* for two years without demanding a jury. He was represented by counsel for more than a year before this court before a demand was made. Such delay can only be classified as inadvertent. Thus, Salahuddin's jury demand will be denied as untimely.

*Sanctions*

Salahuddin has moved for the imposition of sanctions against defendants' counsel on the ground that the foregoing motions for reconsideration are frivolous. The length and content of this memorandum opinion demonstrated that they are not. No sanctions will be imposed.

*Conclusion*

For the reasons set forth above, defendants' motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. is granted as to defendant Egger but denied as to all other defendants. Defendants' motion to strike the jury demand is granted. Salahuddin's motion for sanctions is denied. The pretrial order regarding damages with respect to the First Amendment claim will be submitted on May 11, 1988, and the action thereafter added to the trial calendar.

IT IS SO ORDERED.