In the Matter of RICHARD FLOWERS et al., Appellants, v JAMES SULLIVAN et al., Respondents. (Proceeding No. 1.)

In the Matter of RICHARD FLOWERS et al., Appellants, v JAMES SULLIVAN et al., Respondents. (Proceeding No. 2.)

Second Department, August 21, 1989

## APPEARANCES OF COUNSEL

*Carol Kahn* for appellants.

*Robert Abrams, Attorney-General (Charles C. Davis, Jr.,* and *Jay B. Damashek* of counsel), for respondents.

## OPINION OF THE COURT

EIBER, J.

These appeals raise questions concerning the extent to

which the First Amendment rights *(see,* US Const 1st Amend) of incarcerated persons may be restricted. The petitioners, inmates at the Sing Sing Correctional Facility, seek to overturn regulations promulgated by the New York State Department of Correctional Services which restrict the use, acquisition or possession of certain electronic devices at State correctional facilities. The petitioners in both cases claim, *inter alia,* that the regulations unlawfully deprive them of their right to free access to the media. We cannot accept this contention. Instead, we hold that the challenged directives are reasonably related to legitimate penological concerns and that the Supreme Court, Westchester County, in each proceeding, properly rejected the claims advanced by the petitioners.

## I. *Proceeding Number 1*

By *pro se* petition dated October 14, 1986, the petitioners Richard Flowers and H. Jefferson commenced proceeding number 1 pursuant to CPLR article 78, challenging those portions of Directive number 4911 of the New York State Department of Correctional Services (hereinafter 4911) which allegedly banned the use or possession of A/C electrical adaptors at State correctional facilities and which set a $75 maximum limit on the value of radio or radio/tape player devices possessed by State inmates. The petitioners alleged that the foregoing restrictions were not reasonably related to the promotion of legitimate governmental objectives and that the regulations violated a prior directive which purportedly gave inmates unconditional entitlement to such items. Included in the petition was a request for class-action certification in view of the "State-Wide" applicability of the directive.

The Attorney-General answered the petition, noting that the Superintendent of the Ossining Correctional Facility was vested with the discretionary authority to prohibit A/C electrical adaptors at that facility in accordance with paragraph (2) of part III of Directive number 4920 of the New York State Department of Correctional Services, which provides: "Radios, tape players, and radio/tape player combinations will be of the AM transistor type, battery or AC current; because the electrical systems of certain facilities are not designed to accommodate this equipment, current operated radios, tape players, and radio/tape player combinations may be used only with the permission of the Superintendent".

The Attorney-General, in further defense of 4911, alleged

that the restrictions imposed were "reasonably related to the maintenance of proper order in the prison", that they had not been "unreasonably applied" to the petitioners, and that dismissal of the petition was warranted on the ground that the judiciary should not interfere in the day-to-day administration of correctional facilities. In response to the petitioners' request for class-action certification, the Attorney-General maintained that since the challenged regulations were to be applied in conjunction with the electrical limitations of each facility, certification pursuant to CPLR 901 would be inappropriate.

Following receipt of the answer, the petitioners' assigned counsel submitted an affirmation wherein he alleged that "any items relating to inmates' ability to receive modern media would affect their enjoyment of free speech, free press, as well as personal goals of self-betterment and rehabilitation." In addition to the constitutional arguments, counsel voiced concerns regarding the technical nature of the issues raised and suggested that dismissal of the proceeding would be improper in the absence of expert testimony as to the electrical capacity of the prison facilities.

The Supreme Court (Rubenfeld, J.), focusing first on the petitioners' request for class-action certification, concluded that a class action would not be the "superior method" for the fair and efficient adjudication of the controversy since "any determination would, by virtue of the principle of stare decisis, be binding on the governmental body and automatically benefit all persons in the class claimed to be represented". The Supreme Court also ruled in favor of the respondents, on the merits, and held that the petition was devoid of facts "which rise to a violation of any constitutional or statutory right * * * or which show that respondents went beyond the appropriate exercise of judgment by prison administrators".

The petitioners now seek appellate review of their claims.

## II. Proceeding Number 2

Shortly before the Supreme Court issued its judgment in the aforementioned matter, the petitioner Richard Flowers, joined by fellow inmate Levy Mathis, commenced a separate proceeding pursuant to CPLR article 78, challenging the validity of Directive number 4920 of the New York State Department of Correctional Services (hereinafter 4920), to the extent that it prohibited FM-capacity radio or radio/tape player combina-

tions in 20 designated facilities, including Sing Sing Correctional Facility. Constitutional claims similar to those advanced in the prior proceeding were asserted in their *pro se* petition. Specifically, the petitioners alleged that the unconditional exclusion of FM radio devices in certain facilities was arbitrary, capricious and violative of the rights guaranteed under the First and Fourteenth Amendments of the US Constitution. They claimed that FM-capacity radios did not present a threat to prison security and that they should be allowed to possess such equipment in their cells. They suggested, moreover, that the respondents had been operating prison communication systems on an improper frequency, and that the court should order the disclosure of information pertaining to the FM-operating frequencies of the prison pursuant to the Freedom of Information Law. Finally, the petition again included a request for class-action certification.

The petitioners' court-appointed counsel, while not disputing the extent of discretionary powers conferred upon prison authorities, nevertheless alleged, in an amended petition, that FM radios are not "presumptively dangerous" nor "inherently inconsistent" with prison objectives, that the "selective bar" of FM-capacity broadcasting equipment in maximum security facilities was irrational and that 4920 should be modified so as to eliminate the blanket prohibition against the use or possession of such equipment by State inmates. Additionally, counsel brought a motion requesting a judicial subpoena duces tecum for the release of various documents relating to the electrical specifications of transmission systems at Sing Sing Correctional Facility, and authorization for the petitioners' electronic expert to conduct an on-site inspection, *inter alia,* of the communication systems utilized by Sing Sing Correctional Facility. Counsel alleged that expert analysis regarding the "feasibility of cheaply modifying [the prison's] security transmissions" as well as disclosure of all pertinent documents, would assist in fashioning a remedy which would protect the prison's interests while accommodating the First Amendment rights of the inmates.

The Attorney-General filed separate answers to the *pro se* petition and the amended petition. He initially explained that FM-capacity radios are not permitted at the facilities listed in 4920 "because they interfere with the facilities' Security and Public Safety communications and transmissions [and] can be modified to monitor such transmissions". In his subsequent response, the Attorney-General cited to the decision rendered

in connection with a grievance filed by petitioner Flowers, noting: "The Supervisor of Radio Communications, Division of Support Operations, has determined that any individual with some talent, incentive, rudimentary tools and time could modify an FM radio so as to monitor security or public safety communications. Further, these radios can be adapted to create a wide area of interference. * * * This action could be a major concern during a facility emergency since inmates would know what type of action the facility was going to take to stop the major/minor incident * * *. Thus, the regulation in question is reasonably related to legitimate penological interests."

The Attorney-General further urged that the motion to compel disclosure and to permit an on-site inspection of the prison should be denied for security reasons and to preserve the confidentiality of the security system. He elaborated: "Anyone with the specifications of the security system can either monitor or jam such security transmissions, placing the lives of the corrections officers and inmates in danger." The petitioners' request for class-action certification was also opposed for reasons similar to those cited in the prior proceeding.

The Supreme Court (Buell, J.) rejected the petitioners' substantive contentions, deferring to the judgment of prison officials with respect to the "day-to-day operations of a correction facility". The court further concluded that the challenged regulation was reasonably related to the maintenance of proper order in the prison and that denial of the petitioners' motion for disclosure and class-action certification was warranted for the reasons specified in the Attorney-General's answer.

The petitioners now appeal.

### III.

■ Before addressing the constitutional aspects of the petitioners' claims, we note that prior to the initiation of these proceedings, the petitioner Flowers had commenced a Federal lawsuit pursuant to 42 USC § 1983, challenging the same directives as are at issue in the present litigation. The United States District Court for the Southern District of New York (Leval, J.), in an order dated July 12, 1985, dismissed the action, concluding, in relevant part, that "[i]nmate possession of * * * radios are matters entirely within the purview of

prison officials" and that the regulations in dispute did not violate Flowers's constitutional rights. The Attorney-General, in view of the prior Federal litigation, had suggested that the State proceedings should be summarily dismissed as barred by the doctrine of res judicata. While we would be inclined to adopt this argument insofar as the petitioner Flowers seeks to relitigate claims which he previously presented in the Federal forum *(see, O'Brien v City of Syracuse,* 54 NY2d 353; *Smith v Russell Sage Coll.,* 54 NY2d 185; *Matter of Reilly v Reid,* 45 NY2d 24), we find it necessary to proceed to the merits of the petitions due to the presence of additional litigants in the State proceedings, namely, the petitioner Jefferson in proceeding number 1 and the petitioner Mathis in proceeding number 2. Significantly, neither of these litigants participated in the Federal court action nor is there sufficient proof in the record to establish that these parties were in privity with Mr. Flowers during the pendency of the Federal lawsuit *(see, Green v Santa Fe Indus.,* 70 NY2d 244).

Turning then to the petitioners' substantive contentions, we begin our analysis by reaffirming that an individual does not automatically forfeit all constitutional rights upon conviction of a crime *(see, Matter of Doe v Coughlin,* 71 NY2d 48, 53, *cert denied* — US —, 109 S Ct 196). Thus, in *Matter of Lucas v Scully* (71 NY2d 399, 404), the Court of Appeals recognized that "while incarceration results in the withdrawal or limitation of many rights, inmates retain those rights guaranteed by the First Amendment, and may exercise them to the extent it would not be inconsistent with their status as prisoners and with the legitimate restrictions imposed by confinement". In order to justify the curtailment of the constitutional rights of inmates, the prison regulation must be shown to be reasonably related to legitimate penological interests *(see, Turner v Safley,* 482 US 78). Additionally, the nature and extent of the restrictions imposed must be weighed against the institutional needs and objectives being promoted *(see, Matter of Rivera v Smith,* 63 NY2d 501, 511). In conjunction with these standards, courts must also be mindful of the fact that prison officials are entrusted with the responsibility of maintaining order and security in their facilities and that these officials "possess vast experience * * * upon which to base their regulations and practice in the handling of prisoners consigned to their custody" *(see, Carothers v Follette,* 314 F Supp 1014, 1023). Accordingly, a measure of judicial deference is to be accorded the judgment of correctional authorities when

regulations designed to serve the needs and exigencies of the penal environment are challenged *(see, Matter of Lucas v Scully,* 71 NY2d 399, 406, *supra; Pell v Procunier,* 417 US 817, 827; *see also, Morgan v LaVallee,* 526 F2d 221; *Sostre v McGinnis,* 442 F2d 178; *Burnham v Oswald,* 342 F Supp 880).

■ Applying these principles here, we conclude that the challenged regulations pass constitutional muster when judged in relation to the legitimate penological interests they were designed to promote. Insofar as 4920 is concerned, there is a clear and logical connection between the prohibition against inmate possession of FM-capacity radio equipment and the objective this prohibition was intended to achieve, namely, to prevent inmates from monitoring, intercepting or otherwise interfering with prison radio transmissions. Certainly, the respondents have a significant and perhaps compelling interest in maintaining the confidentiality of information relayed through their communication systems which often concerns matters of prison management and security. It is equally apparent that this valid governmental interest is protected by a regulation which forecloses access to electronic devices which can be adapted so as to cause substantial interference with the orderly administration of the facility and thereby jeopardize the safety of visitors, inmates and prison personnel. As the Court of Appeals so aptly noted in *Matter of Rivera v Smith* (63 NY2d 501, 512-513, *supra):* "The extraordinary difficulties of managing prisons, in which the daily activities of a large number of inmates who have been confined due to their criminal, and often violent, conduct must be supervised, are such that the maintenance of order and discipline is a critical objective. Prison officials are charged with the responsibility, among other things, to secure their institutions against escape, to prevent the transfer or possession of contraband, and to protect the safety of inmates and prison employees. To carry out these formidable tasks in the volatile setting of our correctional institutions requires that prison officials be vested with broad discretion in their formulation of security-related policies."

In the same vein, 4911, to the extent that it regulates inmate possession of A/C electrical adaptors, furthers the legitimate concerns of the facilities in which they are banned. As indicated in the Attorney-General's responsive pleadings, these regulations do not unconditionally prohibit the use or possession of A/C electrical adaptors by inmates. Rather, A/C current operated stereo equipment may be used with the

permission of the Superintendent of the facility. In this case, the Superintendent of the Sing Sing Correctional Facility, by memorandum dated August 1, 1986, determined that A/C electrical adaptors were to be prohibited at the facility due to the limited electrical output capabilities of that facility. Clearly, the asserted goals of minimizing the danger of fires, overloaded circuits, power failures and other potential hazards which might result from the additional electrical draw of A/C-current-operated radio equipment justifies this reasonable and nonintrusive restriction. The need for order and safety in any institutional setting and, particularly, the prison environment, is obvious. Under such circumstances, we can reach no other conclusion but that the restriction against A/C adaptors withstands constitutional scrutiny when viewed in conjunction with the goals it effectuates (see, Arteaga v State of New York, 72 NY2d 212; Matter of Lee v Coughlin, 142 AD2d 802, appeal dismissed 72 NY2d 1041, cert denied — US —, 109 S Ct 807; Overton v Coughlin, 133 AD2d 744; Matter of Abdullah v Coughlin, 131 AD2d 471).

Again, in the absence of any demonstration by the petitioners to the contrary, we hold that the $75 maximum limitation on the value of inmates' stereo equipment is supported by practical considerations which are compatible with the needs and interests of penal facilities. The stated justification for this regulation is to deter theft within the prison. Logic, of course, dictates that a monetary cap on the value of stereo equipment would effectively reduce the risk of criminal activity among the inmates by obviating the temptations occasioned by the presence of expensive stereo equipment in prison cells. Such an objective is reasonably and inexorably related to the maintenance of prison security, order and discipline. These concerns, as indicated previously, afford a sufficient basis for upholding the constitutional validity of the regulation.*

In sum, judicial review of the constitutional propriety of prison regulations must be tempered by rules of reason and common sense. There is no basis in the record before us to doubt the sincerity and bona fides of the justifications advanced by the respondents in support of the challenged regu-

---

* According to the Attorney-General, inmates may obtain permission to possess radio equipment of a value in excess of the $75 maximum limitation by means of an appeal to the Commissioner. Thus, the regulation, to the extent practicable, does provide for an accommodation of the interests asserted by the petitioners.

lations. Nor do we harbor doubts as to the constitutional sufficiency of these justifications *(see, Matter of Doe v Coughlin,* 71 NY2d 48, *supra; Matter of Lucas v Scully,* 71 NY2d 399, *supra; Matter of Brown v McGinnis,* 10 NY2d 531). It is also important to emphasize that the subject regulations are not only content-neutral, but were narrowly drawn to accomplish specific and legitimate purposes. Significantly, the regulations do not foreclose access to AM-radio channels, tape cassettes and battery-operated transistor devices. Thus, there are sufficient alternative means by which inmates may exercise their asserted constitutional rights *(see, Turner v Safley,* 482 US 78, *supra).* Although the petitioners maintain that there may be a means of cheaply modifying prison electrical systems to accommodate their interests, it must be stressed that "[t]he nature of a correctional facility, where confinement and order are necessary, is such that inmates cannot be afforded * * * rights as broad as those enjoyed outside the prison setting" *(see, Matter of Rivera v Smith,* 63 NY2d 501, 511, *supra).* Moreover, the United States Supreme Court has acknowledged that "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the * * * constitutional complaint[s of inmates]" *(Turner v Safley,* 482 US 78, 90-91, *supra).* Lastly, and perhaps most decisively, it is not the role of the courts to indulge in speculation as to the proper allocation of prison resources or to invade the province of correctional authorities, who are afforded considerable latitude in fashioning rules for the guidance and control of inmates and the management of penal institutions *(see, Block v Rutherford,* 468 US 576; *Jones v North Carolina Prisoner's Union,* 433 US 119; *Procunier v Martinez,* 416 US 396). Rather, our task is to assure that the conditions of confinement comport with constitutional demands *(see, Bell v Wolfish,* 441 US 520). In the context of the present proceedings, the respondents have demonstrated, to our satisfaction, that the contested regulations serve important governmental purposes and that there is a substantial and logical relationship between the means chosen and the ends sought to be accomplished. Accordingly, it cannot be said that the directives unconstitutionally abridge the rights asserted by the petitioners.

The petitioners' additional contention regarding the denial of their request for disclosure under, *inter alia,* the provisions of New York's Freedom of Information Law (Public Officers Law art 6) (hereinafter FOIL) warrants but brief discussion.

Although FOIL expresses this State's strong commitment to public accountability and imposes a broad standard of disclosure upon the State and its agencies *(see, Matter of Capital Newspapers v Burns,* 67 NY2d 562; *Matter of Farbman & Sons v New York City Health & Hosps. Corp.,* 62 NY2d 75; *Matter of Fink v Lefkowitz,* 47 NY2d 567), the Legislature, cognizant of the need to retain the confidentiality of certain information, promulgated several categories of exemptions to the disclosure requirements of the statute (Public Officers Law § 87 [2]).

In this case, the information sought to be disclosed, namely, specifications and other data relating to the electrical and security transmission systems of Sing Sing Correctional Facility, falls within one of the exemptions. Public Officers Law § 87 (2) (f) permits an agency to deny access to records or portions thereof, if disclosure would endanger the life or safety of any person. Thus, in *Matter of Nalo v Sullivan* (125 AD2d 311), this court found that a New York State Department of Correctional Services inmate file containing documents upon which it based its determination that the petitioner was an escape risk, was exempt from disclosure as, *inter alia,* material which could endanger the lives or safety of certain individuals. Likewise, in *Matter of Fournier v Fish* (83 AD2d 979), the petitioner, an inmate at the Dannemora Correctional Facility, sought access to certain records maintained by the Department of Correctional Services. Although the petitioner's FOIL request was partially honored, the correctional facility deemed it necessary to excise specific information pertaining to the location in the facility of prison records. On appeal, the Appellate Division, Third Department, citing to Public Officers Law § 87 (2) (f), concluded that it was entirely appropriate for the correctional facility to have withheld this information on the ground that its revelation would jeopardize prison security.

The same rationale may be invoked to preclude the FOIL request at bar. It seems clear that disclosure of details regarding the electrical, security and transmission systems of Sing Sing Correctional Facility might impair the effectiveness of these systems and compromise the safe and successful operation of the prison. These risks are magnified when we consider the fact that disclosure is sought by inmates. Suppression of the documentation sought by the petitioners, to the extent that it exists, was, therefore, consonant with the statutory exemption which shelters from disclosure information which could endanger the life or safety of another.

For related reasons, we conclude that it was not an improvident exercise of discretion for the Supreme Court in proceeding number 2 to have quashed the petitioners' judicial subpoena duces tecum and to have denied their request to allow their electrical expert to conduct an on-site inspection of Sing Sing Correctional Facility. Suffice it to say, the need articulated by the petitioners in support of disclosure is most decidedly outweighed by the necessity of preserving prison security.

We have examined the petitioners' remaining contentions and find them to be without merit.

LAWRENCE, J. P., SPATT and BALLETTA, JJ., concur.

Ordered that the judgments are affirmed, without costs or disbursements.