OPINION OF THE COURT
Reinaldo E. Rivera, J.
I. INTRODUCTION
This matter is before the court by writ of habeas corpus. The defendant, an insanity acquittee detained at South Beach Psychiatric Center in Richmond County pursuant to CPL 330.20, petitions the court for a furlough for the Jewish High Holidays of Rosh Hoshanah, Yom Kippur and Succoth. The Kings County District Attorney and the New York State Attorney-General, counsel for the Office of Mental Health and South Beach Psychiatric Center, oppose the defendant’s application.
A. Factual and Procedural History
On November 5, 1989, the defendant brutally killed his mother by striking her in the head with a hammer. On November 22, 1989, he was indicted for this in Kings County. On January 24, 1991, pursuant to CPL 220.15, the defendant entered a plea of not guilty by reason of mental disease or defect to murder in the second degree. The Supreme Court, Kings County, issued an examination order pursuant to CPL 330.20 (2).
On April 11,1991, the defendant was found to have a dangerous mental disorder. The court issued a commitment order and the defendant was sent to Mid-Hudson Psychiatric Center. Thereafter, on October 10, 1991, the Supreme Court, Orange County, issued a first retention order pursuant to CPL 330.20 (8). A second retention order and transfer order were issued in October 1992 authorizing the defendant’s transfer to South Beach Psychiatric Center. On October 24, 1994, the Supreme Court, Richmond County, issued a retention order for a two-year period.
The defendant escaped from South Beach on May 12, 1995. On May 17, 1995, a recommitment application was filed. A warrant was issued on May 19, 1995, upon the defendant’s failure to appear at his recommitment hearing. He remained a fugitive until June 1997.
While the defendant was at large, he contacted staff members at South Beach. He reportedly made statements to staff at *435 South Beach that he “couldn’t take it any more”, that he felt like doing “bad things” and he felt like “stabbing children”. On June 5, 1997, the defendant called 911. He was taken by the police to Maimonides Hospital and was returned to South Beach. The defendant is diagnosed with schizo-affective disorder which affects his ability to think, feel, recall and relate normally; he has episodes where he has refused his medication, and has decompensated in hospital settings; since his re-confinement, he allegedly threatened that “there would be bloodshed” unless he was given his cigarettes, he would go crazy and strike out if prevented from smoking, and would not agree violence would be an inappropriate option, and he believes if he were to feel persecuted, violence would become necessary; the defendant’s recent mental status evaluation provided by South Beach states the defendant continues to suffer from an encapsulated delusional thought disorder and he is extremely preoccupied with “freedom” to smoke and spend time outside; the defendant is a proven escape risk; with the assistance of his family, he escaped from South Beach and avoided apprehension for two years. During the time he was an escapee, he lived with family members in and around New York City and with the Tash Hasidic Community near Montreal, Canada, and traveled to Israel twice. He now seeks release to his family so that he could celebrate the Jewish High Holy Days with his family.
II. PRELIMINARY ISSUES
B. Furlough Applications
The issuance of furlough orders for defendants committed to the custody of the Commissioner of Mental Health are governed by CPL 330.20 (10) and 14 NYCRR 541.6. CPL 330.20 (10) provides: “The commissioner may apply for a furlough order * * * when * * * consistent with the public safety and welfare of the community and the defendant, the clinical condition of the defendant warrants a granting of the privileges authorized by a furlough order.”
The Commissioner opposes granting the defendant a furlough on the basis that his clinical condition does not warrant it and a furlough would not be consistent with the public safety and welfare of the defendant and the community. In determining the application a crucial consideration is that the issue of dangerousness has not been judicially resolved. The State’s recommitment application which contains allegations that the *436 defendant has a dangerous mental disorder is still pending. If a patient-initiated furlough application were permissible and/or warranted, it would be premature to grant such an application prior to a formal judicial determination as to whether the defendant presents a danger to himself or others. (See, People ex rel. Thorpe v Von Holden, 63 NY2d 546 [1984].)
III. QUESTIONS PRESENTED
(1) To what extent must a patient detained under CPL 330.20 and alleged to be dangerously mentally ill be provided with the means to observe his or her religion in accordance with the strictures and tenets of the patient’s religious beliefs? (2) What constitutes adequate, reasonable and related legitimate institutional objectives within permissible constitutional limits in restricting a CPL 330.20 detainee’s ability to practice his or her religion? (3) What rule or analysis may the court properly apply in balancing the competing interests?
TV. issue(s) in controversy
The defendant is an adherent of an ultra-observant Hasidic branch of Judaism. South Beach provides the following accommodation for him to practice his faith: (1) a specific area to pray on Sabbath and Holy Days, i.e., the facility’s chapel; (2) relief from duties for daily and/or Sabbath prayer; (3) constant wearing of yarmulke and Hasidic garb; (4) Kosher diet; (5) availability of sacred books and prayer accessories; (6) unrestricted growth of beard; and (7) availability of an Orthodox chaplain. In addition, it offered the following arrangements for the High Holy Days of Rosh Hoshanah and Yom Kippur: a Rosh Hoshanah service on Tuesday, September 30, 1997, and Yom Kippur services on Thursday, October 9, 1997. (The services are scheduled to be held before the actual holiday due to the rabbi’s inability to travel during the Holy Days.) The ceremonial horn, or shofar, will be blown and the services will attempt to capture the essence of a traditional Jewish service. Based on the facility’s census, there are more than 10 adult Jewish males who would constitute a minyan in accordance with the requirements of Jewish law. South Beach agreed to permit construction of a donated succah in the secure courtyard of the hospital for the defendant’s use during Succoth, and with the defendant’s agreement, for the use of any other Jewish patients who wished to use it.
The defendant asserts and counters that in order to properly observe the Holy Days, the minimum accommodation consis *437 tent with his First Amendment rights requires the hospital to provide the following: a rabbi to conduct services on the actual calendar days on which the Holy Days occur; at least eight other Jewish males to participate with the defendant and the rabbi in the services so that the religiously required minyan is present; that a Torah (scroll of Pentateuch) and a shofar (ram’s horn) be provided; that sleeping accommodations and eating facilities for the rabbi and the members of the minyan be provided inasmuch as observant Jews are not permitted to travel via vehicle during the Holy Days. The defendant rejects the institution’s accommodations as inadequate alleging that the fact that there may be 10 Jewish male patients at the facility does not mean that they will gather for prayer, thus there is no guarantee that a minyan will be available; that the hospital’s offer to provide services on days other than the actual Holy Days means that the defendant will not be able to fulfill the obligations of his religion by observing on the proper day. Moreover, if the hospital does not provide the minimum accommodations, his right to the free exercise of his religion requires that he be permitted to leave South Beach over the Holy Days in order to properly observe his religious beliefs. As an alternative to the minimum requirements, the defendant requests that he be admitted as an inpatient to a nonsecure mental health facility, Pesach Tikvah/Door of Hope in Brooklyn, at which Orthodox services will be held on the Holy Days.
The defendant further contends that his release for the Holy Days to spend time with his family and community would be extremely beneficial, that his behavior during the two years he was absent from South Beach as an escapee proved him to be responsible, that he took his medication regularly, sought and received psychiatric care, did not have any violent episodes, that he lived, studied, worshipped and traveled in and between Brooklyn, Montreal and Israel without incident and that his psychiatrist is of the opinion that his release would not be dangerous for the defendant or others.
V. LEGAL ANALYSIS AND APPLICABLE LAW
The People, relying on Turner v Safley (482 US 78 [1987]), urged this court to apply the analyses in Federal and New York State cases involving constitutional challenges by inmates to prison regulations on the premise that there are substantial parallels between insanity acquittees and prisoners.
The defendant argues that prisoner’s rights cases are inapplicable because the therapeutic interests of a psychiatric *438 hospital differ from penological interests in punishment and segregation from society; that patients in psychiatric institutions retain more rights than prisoners.
It is settled law that the Federal Constitution, the New York State Constitution and Correction Law § 610 guarantee prisoners the right to free exercise of religion. Notwithstanding the importance of those rights guaranteed by the First Amendment, they are subject to reasonable restrictions related to le: gitimate penological goals and objectives. (Turner v Safley, 482 US 78 [1987], supra; Matter of Lucas v Scully, 71 NY2d 399 [1988]; Matter of Rivera v Smith, 63 NY2d 501; Jackson v Coughlin, 156 Misc 2d 975.)
The State standard for determining the validity of prison regulations impinging on the constitutional rights of inmates requires the “balancing of the competing interests at stake: the importance of the right asserted and the extent of the infringement are weighed against the institutional needs and objectives being promoted”. (Matter of Lucas v Scully, supra, at 406.)
The Federal standard has been articulated by the Supreme Court of the United States as follows: “when a prison regulation impinges on inmates’ constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests”. (Turner v Safley, supra, at 89; O’Lone v Estate of Shabazz, 482 US 342 [1987].)
Factors identified in Turner (supra) as pertinent to a determination of validity of prison regulations include: (1) whether there is a logical connection between the prison regulation and the institution’s interest put forward to justify it; (2) whether there are alternative means available for exercising the asserted right—in this regard, the court should be conscious of the measure of judicial deference owed to correction officials; (3) whether accommodation of the asserted right will have an adverse impact on other patients or on the allocation of institutional resources; and (4) whether there is an obvious easy alternative means of exercising the asserted right. The absence of ready alternatives is evidence of reasonableness. If the claimant can point to a de minimis alternative, the court may consider that as evidence that the regulation is unreasonable.
The application of the Turner rationale provides meaningful guidance in balancing the asserted rights of the defendant against the legitimate clinical interests of South Beach. The legitimate clinical interests of the hospital are: (1) security, (2) *439 confinement, (3) the prevention of escapes, (4) therapy, and (5) rehabilitation. (People v Ortega, 127 Misc 2d 717, 728.) Prevention of patient disruption from unequal treatment such as personal exemptions from hospital policies is another valid concern.
An institution by its nature requires subordination of individual rights and privileges guaranteed by the Constitution, to the needs of the institution. (See, Goldman v Weinberger, 475 US 503 [1986].) The Constitution requires that no person be deprived of those rights or liberties without due process of law. Rigorous due process safeguards and judicial scrutiny are brought to bear when individuals are subject to the loss of an individual liberty interest or fundamental right in the face of an asserted compelling State interest. (Rivers v Katz, 67 NY2d 485 [1986].)
Prisoners are subject to restrictions on their free exercise rights when the restriction imposed is reasonably related to the legitimate goals and objectives of the penological institution. Individuals subject to involuntary civil commitment or to commitment following an insanity plea are properly subject to reasonable restrictions consistent with the legitimate interests of the institution where the patient is confined.
Moreover, a policy of judicial restraint is favored when institutional regulations are challenged on First Amendment grounds. The appropriate standard of review of a regulation of a coordinate branch of government that clashes with constitutional rights is whether legitimate institutional ends are sought to be achieved and whether the restriction is designed to accommodate the individual right to an appropriate degree. (Goldman v Weinberger, supra; Turner v Safley, 482 US 78, supra.)
Substantial similarities exist between the security concerns and rehabilitative goals of prison administrators and the administrators of psychiatric institutions. The parallels give further support to the adoption of prisoners’ rights case analysis to the issue(s) raised herein. CPL 330.20 evidences a clear legislative intent to keep criminal acquittees within the Criminal Procedure Law’s continued oversight, due to the potentiality of a dangerous mental disorder. (People v Stone, 73 NY2d 296 [1989]; see, Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 330.20, at 22.) A recommitment order based on a finding of current dangerousness may validly be issued for a criminal acquittee subject to an order of conditions, even where the acquittee was found after an initial *440 hearing not to be suffering from a dangerous mental disorder or mental illness. (Ibid.)
The State’s interest in maintaining security and control over CPL 330.20 defendants is evidenced by the provisions governing escapees. CPL 330.20 (19) authorizes peace officers to apprehend escapees without a warrant and imposes a duty on the officers to take the defendant into custody upon the request of any representative of the Commissioner.
Significantly, courts have recognized that CPL 330.20 defendants may properly be treated somewhat differently from persons subject to civil commitment. (People ex rel. Thorpe v Von Holden, 63 NY2d 546 [1984], supra.) For instance, in proving dangerousness of CPL 330.20 defendants the State is held to the less demanding burden of preponderance of the evidence in contrast to the clear and convincing standard applicable to civil committees. (People v Escobar, 61 NY2d 431 [1984].) Courts are permitted to consider the nature of the insanity acquittee’s criminal act in making a determination of current dangerousness. (Matter of George L., 85 NY2d 295 [1995].) The State has a legitimate interest in minimizing the risk of future violence by a person who has previously engaged in criminal behavior. (See, People v Escobar, supra.) Studies of insanity acquittees indicate a recidivism rate equal to that of prison populations. (Matter of George L., supra.)
CPL 330.20 guarantees defendants committed pursuant to the statute the rights granted to patients under the Mental Hygiene Law. (People ex rel. Thorpe v Von Holden, supra; People v Escobar, 61 NY2d, supra, at 438; CPL 330.20 [7], [21].) Neither the nature of the criminal act nor the statistical probability of relapse, standing alone, are sufficient to justify the significant limitations on an insanity acquittee’s liberty interest which accompany secure confinement. (Matter of George L., supra.)
Nonetheless, it is well established that different treatment of civil committees and insanity acquittees, who have established their dangerousness by the act of violence by reason of which they stand acquitted, comports with equal protection guarantees and due process. (People ex rel. Thorpe v Von Holden, supra; People v Escobar, supra.)
VI. FINDINGS AND CONCLUSIONS
This court may properly decide the instant application on its merits. The defendant was committed by due process of law. Furlough applications are required to be initiated by the Com *441 missioner of the Office of Mental Health, not by the patient. In the matter herein the hospital maintains that the defendant, an insanity acquittee, a proven escape risk, diagnosed with a dangerous mental disorder, posing a danger to himself and others, should be kept in the secure facility and the furlough denied as inconsistent with the defendant’s safety or that of the community. This court is obliged to give due and appropriate deference to the medical and administrative experts and agrees with their assessment. The defendant has failed to prove by a fair preponderance of the evidence that he may be released on furlough without danger to himself or others.
The defendant has not established to the satisfaction of this court that his rights to free exercise of religion have been violated, nor that his continued retention in the hospital is not rationally related to legitimate clinical interests of the Office of Mental Health.
This court deems it appropriate to adopt the rationale enunciated by the Supreme Court in Turner v Safley (482 US 78, supra) to determine if the restrictions imposed impermissibly impinge upon First Amendment rights.
Upon application of the Turner standard, an assessment by this court of the adequacy of the accommodations provided to defendant by the hospital for the High Holy Days finds them adequate, reasonable and/or related to legitimate institutional and societal objectives and to pass constitutional muster. More specifically: (1) There is a legitimate government interest in the State’s determination that a furlough is not warranted. The determination that the defendant remain in secure confinement at this time is consistent with the legitimate clinical interests of South Beach. Permitting the defendant to leave would be inherently inconsistent with such legitimate institutional objectives. (2) There are no reasonable alternative means available for the defendant to properly observe the Holy Days in the institution. The defendant’s suggestion that the hospital provide sleeping accommodations and meals for a rabbi and eight Jewish males to spend the Holy Days at South Beach is unreasonable. (3) Accommodation of the asserted right in any of the alternative forms suggested by the defendant will have an adverse impact on other patients. To permit an escorted furlough will result in reduced staff at the hospital and special consideration for this defendant unavailable to other similarly situated patients. Such an accommodation is unreasonable and would create an untenable precedent. (4) There are no obvious, easy alternatives. The proposal that the defendant be trans *442 ferred to another facility for the Holy Days where Orthodox services will be conducted on the premises is not an easy alternative. It requires an unreasonable commitment of State resources and translates into special accommodation not available to other similarly situated patients. The absence of obvious, easy alternatives is evidence of the reasonableness of the hospital’s accommodation.
The defendant has not pointed to an alternative that fully accommodates his rights at a de minimis cost to valid institutional interests. Furthermore, the defendant has not previously during his confinement challenged the hospital’s High Holy Day arrangements as an infringement of his First Amendment rights. The defendant’s acquiescence in the accommodation provided by the hospital in past years is additional evidence of its reasonableness.
VII. DECISION
The State has a clear interest in protecting the welfare of its citizens from the dangerous acts of others. Upon balancing the fundamental constitutional rights of the individual and the State’s compelling interest in safeguarding him and the community at large, within the context of this defendant’s clinical condition and the hospital’s accommodations, this court finds that the restrictions on the defendant’s ability to practice his religion are not unconstitutional.
Accordingly, the defendant’s writ of habeas corpus is hereby dismissed.