Hillary BEST, Plaintiff,

v.

Walter R. KELLY, Frederick N. Richardson, William McNulty, Jeff Carter, Reuven Schwartz, Thomas Coughlin, and Earl B. Moore, Defendants.

No. 87–CV–1065C.

United States District Court,
W.D. New York.

March 16, 1995.

---

**306**

Brockway Law Offices (Bryan G. Brockway, of counsel), Buffalo, NY, for plaintiff.

Dennis C. Vacco, Atty. Gen. of the State of N.Y. (Andrew Lipkind, Asst. Atty. Gen., of counsel), Buffalo, NY, for defendants.

CURTIN, District Judge.

Plaintiff has filed suit under 42 U.S.C. § 1983, claiming that his First Amendment rights to free exercise of religion were violated because he was removed from the Attica Correctional Facility's alternative diet and not permitted to attend services of the Jewish congregation in the prison. Plaintiff arrived at the Attica Correctional Facility in March of 1986 and stayed there until July 1988, when he transferred out of Attica at his own request. Defendants have moved for summary judgment, seeking an order dismissing the complaint. The court has considered the affidavits and detailed memoranda supplied by the parties in arriving at its decision.

Defendants contend that neither the removal of Mr. Best from the Jewish congregational services nor defendants' refusal to serve him the alternative diet served to Jewish inmates violated plaintiff's constitutional rights. They contend that plaintiff is not Jewish, and he was disruptive during meetings and services of the Jewish congregation. They state that he was permitted to exercise his religion in his cell and to fashion what he considered an appropriate diet from alternative sources, and therefore, his removal from the congregation and from the alternative diet was proper.

While growing up, plaintiff attended Episcopalian services with his family. Plaintiff says that he first identified himself as Jewish while in a New Jersey correctional facility in 1977, but at that time he considered himself a non-observant Jew and did not attend religious services. Between 1978 and 1981, plaintiff did not participate in any religious service. In 1981, while incarcerated in New York, plaintiff began to meet with a variety of religious groups. He first attended Catholic services; then he joined the Islamic community, eventually making a public declaration of belief in Allah. In 1982, he joined a Protestant group; and in 1983, he returned to the Catholic services. Finally, in 1984, plaintiff had contact with a Rabbi and began

attending Jewish services at Clinton Correctional Facility. According to plaintiff, the Rabbi at Clinton did not inquire into his religious history.

When plaintiff arrived in Attica in March 1986, the Jewish Chaplain was Rabbi Hoffman, who also did not inquire into his religious background. He was issued a religion ID card stating he was Jewish. Plaintiff began attending weekly Jewish services, prayer readings, and discussion of religious topics. In addition to attending weekly services, he also practiced his religious beliefs by individual prayer in his cell, reading religious texts, and consultations with the Rabbi. Plaintiff obtained what he thought was a religiously appropriate diet, either from outside sources or from the Attica Commissary, consisting mostly of non-cooked foods, such as fruits and vegetables and dairy products. After plaintiff's outside source of food dried up in October 1986, plaintiff asked Deputy Superintendent McAnulty to add him to the list of Jewish inmates receiving the alternative diet on October 29, 1986. By that time, Rabbi Hoffman had retired, and plaintiff's request was referred to the Senior Chaplain, Reverend Jeff Carter, a Christian clergyman, who approved the request on November 11, 1986.

In March of 1987, Rabbi Ruven Schwartz became the Jewish Chaplain at Attica. He allowed plaintiff to continue to attend Jewish services and have the alternative diet. After a time, however, the Rabbi came to view plaintiff as a disruptive influence because he interrupted and challenged points that the Rabbi was trying to teach, saying that the Rabbi was wrong and should follow plaintiff's interpretations of Jewish Law. Rabbi Schwartz found that the challenges derived from plaintiff's ignorance of Jewish religious principles. He concluded that the interruptions were affecting the other inmates in the group who were trying to learn and who had complained to him about the plaintiff. Finally, he investigated the religious background of all members of the group in accordance with the policy of the New York Board of Rabbis and concluded that plaintiff was not a Jew under any recognized interpretation of Jewish law. He concluded that plaintiff was not sincere about Judaism but rather was using the diet for "recreation and sport."

On June 23, 1987, the Rabbi issued a memo telling plaintiff that he was not entitled to be a member of Attica's Jewish population. He said that plaintiff could practice his particular religious beliefs in his cell or elsewhere in the facility. He told him that he could follow the diet he chose by making purchases in the commissary. Plaintiff protested; and when the Rabbi refused to change his position, he complained to Attica's senior Chaplain, Reverend Carter, and Superintendent Kelly.

Each of these officials deferred to Rabbi Schwartz's determination as to who was properly a member of the Attica Jewish community. Reverend Carter advised plaintiff that he had to meet the requirements of Jewish law in order to be a member of that community, and he would follow Rabbi Schwartz's determination as to who was Jewish. Following this, plaintiff filed a grievance complaining of his exclusion from the Jewish congregation and the alternative diet. First Deputy Superintendent Richardson relied upon Rabbi Schwartz's determination and denied the grievance.

Plaintiff was removed from the diet on June 17, 1987. However, on August 25, 1987, in response to the plaintiff's numerous complaints, Rabbi Schwartz relented and allowed plaintiff to again partake of the alternative meals. Plaintiff followed this diet until October 18, 1987, when plaintiff, complaining that the food was spoiled, requested that he be taken off the diet.

Plaintiff relies upon the Department of Corrections Directive 4202, which provides that the policy of the Department is to give as much spiritual assistance as possible for inmates to practice their chosen faith, limited only by security considerations. However, Directive 4202F(2) states that an inmate may attend only the religious program of his designated religion as noted in the facility records. Here, plaintiff claims that he had a Jewish I.D. card and, therefore, he should be permitted to attend the services.

The defendants have supplied the affidavit of Rabbi James L. Mulrey, an Orthodox Rabbi and presently Area Chaplain in Western

New York. He stated that limiting participation to the Jewish community to persons who are *bona fide* Jews respects and preserves the religious doctrine of the participants. Judaism refrains from proselytizing, discourages conversions generally, and refrains from permitting conversions in prison. His affidavit relates that Jews pray more comfortably together when amongst themselves, and that the presence of other persons is sometimes perceived as invasive to the religious atmosphere. Therefore, restrictions as to who can attend services are directly related to the goal of providing a suitable religious atmosphere for the spiritual development and rehabilitation of the members of the identified religious group.

In addition, the defense contends that restriction of the alternative diet to *bona fide* members of the Jewish faith is related to the goal of preventing undue administrative burden and cost. If a number of inmates opted for the alternative diet, costs would increase substantially. The defendant argues that whether the plaintiff actually disrupted services is immaterial because the decision as to who should be allowed to attend services and participate must be left to the religious leader of that group. As long as he gave some reason for his decision and if his decision rests upon a legitimate penological interest it should not be disturbed.

### DISCUSSION

■ In this case, we have a conflict between the right of plaintiff to practice his religion and the administration's right and need to run a secure and orderly facility. When a prisoner challenges a regulation as an infringement of a constitutional right, the court must balance respect for that right against deference to the judgment of prison administrators. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir.1990). Until recently, defendant administrators could satisfactorily justify a challenged restriction by showing that it is "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404–05, 96 L.Ed.2d 282 (1987). *See also Jones v. North Carolina Prisoners Labor Union, Inc.*, 433 U.S. 119, 129–30, 97 S.Ct. 2532, 2539–40, 53

L.Ed.2d 629 (1977) (The inmate is allowed only those constitutional rights that do not conflict with legitimate objectives of prison administration). However, when Congress enacted the Religious Freedom Restoration Act of 1993 ("RFRA"), it restored an earlier "compelling interest" standard set forth in *Sherbert v. Verner* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The RFRA states in pertinent part that:

> [The] government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of the furthering that compelling governmental interest.

42 U.S.C. § 2000bb–1(b) (Supp.1994). This standard applies in the prison context. *See, e.g. Campos v. Coughlin*, 854 F.Supp. 194 (S.D.N.Y.1994). Therefore, to determine whether the plaintiff's first amendment rights were violated, the court must consider whether the challenged restriction: (1) substantially burdens plaintiff's exercise of his religion; (2) furthers an asserted penological interest which can be regarded as a "compelling governmental interest;" and (3) employs the least restrictive means to accomplish its objective.

■ It is not at all clear in this case that prohibiting plaintiff from participating in congregational meetings and refusing to provide him with an alternative diet for a short time period substantially burdened plaintiff's exercise of his religion. Plaintiff was allowed to practice his religious beliefs in the privacy of his cell as he saw fit. While prison directives indicate that the Department of Correctional Services should make religious meetings available, plaintiff has not alleged that attendance at services is essential to following his religion.

It also does not appear that plaintiff requested a special diet primarily for religious reasons. From his affidavit, it appears that plaintiff was a vegetarian. He had obtained a diet which he had found satisfactory from the commissary before he began to attend

the formal services. He only requested a diet which conformed to Jewish law when he could no longer supply his dietary needs from outside sources. He was deprived of a kosher diet for a short time and voluntarily removed himself from it after it was reinstated. Thus, plaintiff has not raised a genuine dispute that the temporary withdrawal of an alternative diet infringed upon his freedom of religion.

Finally, plaintiff's claim that his First Amendment rights were violated by the taking of his Yarmulke is without merit. There is no right to wear the Yarmulke outside of the cell. *Young v. Lane*, 922 F.2d 370 (7th Cir.1991). Further, although a Yarmulke was taken from him, he concedes that it was returned and that he had others available in his cell.

Even if the plaintiff had been "substantially burdened," defendants clearly have a compelling interest in maintaining order and security in the institution. *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). This interest includes enabling prisoners to exercise their freedom of religion within the necessary restrictions of prison security. When a prisoner disrupts congregational meetings and interferes with the rights of others, prison officials should be able to provide alternate means for the exercise of religion without constitutionally infringing any First Amendment rights.

In this case, the defendants correctly barred the plaintiff from attending congregational meetings in response to Rabbi Schwartz's report that the plaintiff was disruptive to the point of interfering with other inmates' rights of worship. Although plaintiff filed affidavits from fellow inmates which disagreed with the Rabbi's assessment of plaintiff's behavior, prison administrators at Attica legitimately furthered the needs of internal security and order in upholding the Rabbi's decision. Plaintiff had full opportunity to complain to the administration, and it is evident in the record that his complaint was given careful consideration and rejected. The defendants cannot be required to accommodate the religious practice of one individual if doing so offends the religious integrity of the identified religious group, whose leader explained with good reason why the person should not be allowed to attend the services.[1]

In sum, I find that the actions taken by the prison administrators did not substantially burden the plaintiff's exercise of religion. The restrictions placed on plaintiff's religious practice served a "compelling state interest" using the least restrictive means. Therefore, the motion of defendant for summary judgment is granted, and the complaint is dismissed.

So ordered.

Plaintiff's beliefs are only entitled to First Amendment protection if they are sincerely held, and in the plaintiff's "own scheme of things, religious." *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863, 13 L.Ed.2d 733 (1965); *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984). However, neither party has raised plaintiff's sincerity of belief as an issue for summary judgment.

---

1. From the affidavits, it is clear that Rabbi Schwartz's determination that the plaintiff was disruptive during the meetings was based in part on the fact that plaintiff was not a Jew by family background, prior religious attendance, or in his attitude toward traditional Jewish beliefs. This background, combined with his movement from one group to another, creates a question as to whether plaintiff was sincere in his stated beliefs.