OPINION OF THE COURT
Daniel D. Angiolillo, J.
Petitioner was an inmate at Bedford Hills Correctional Facility when she commenced this proceeding. She alleged respondents were depriving her of her constitutional right to the free exercise of her religious beliefs. Subsequent to the commencement of this proceeding, petitioner was transferred to Albion Correctional Facility. Petitioner communicated with the court subsequent to her transfer and indicated the situation at Albion relative to her exercise of her religious beliefs remained problematic. While petitioner’s complaint in part stemmed from the determination and procedures of Rabbi Fine, the Jewish chaplain at Bedford Hills, the issues raised in large part are addressed by State law and regulations that would be applicable to petitioner anywhere in the correctional system. Given the number of adjournments granted to respondents and the length of time that has elapsed from petitioner’s initial application to this" decision, the issues will be addressed rather than held to be moot with petitioner’s transfer. There is also no indication that petitioner could not be transferred back to Bedford.
The issue presented in this proceeding is the extent of permissible restriction that may be imposed by respondents on petitioner’s exercise of her religious beliefs. Petitioner asserts that she is a Jew. It is her desire to fully participate in all of the religious observances available to the Jewish population of the institution where she is housed. She asserts respondents are wrongfully interfering with that expression.
The respondents have primarily delegated the determination of the scope of petitioner’s freedom to participate in congregate services to the religious advisor to those of the Jewish faith at Bedford, Rabbi Fine. Rabbi Fine determined that petitioner is not Jewish. That determination was premised on the fact petitioner is apparently unable to produce documents of conversion, that she is unable to provide the name of a Rabbi *463 to be contacted to verify that she had undergone a conversion, and due to petitioner’s classification on the prison intake material as being Baptist.
There is no assertion by petitioner that she is Jewish by birth. Her claim is that she is Jewish as a result of years of study and participation in Jewish observances including being a Bas-Mitzvah. There is no indication that petitioner’s assertions are anything less than a sincere and strongly held expression of her beliefs.
In response to the petition, Rabbi Fine set forth the bases for his determination that petitioner is not a Jew by conversion. "As the Jewish chaplain, I am authorized by the State to make that determination * * * And Ms. Thomas’ claim to being Jewish would not be recognized in any part of the organized Jewish world.” (Respondents’ answer, exhibit E.) That assertion is supported by an exhibit submitted by petitioner. Petitioner has been in correspondence with the Aleph Institute, an association providing support to Jews including those who are incarcerated. In response to petitioner’s request that the Rabbis of the Aleph Institute declare her to be Jewish, the prisoner services coordinator wrote that such a declaration would not be possible. "All the Rabbis here are very orthodox, and among orthodox people conversion is very sparingly granted. It is made difficult for many reasons. It is something that is only accomplished by long hard years of study with a certified Rabbi, and it must come from the heart to be Jewish without any ulterior motives. In addition, it is almost impossible to convert and be orthodox within a prison setting as the mandated rituals for such conversion could not take place.” (Letter of Robert Burns, dated Nov. 2, 1996.)
Respondents submitted a copy of a policy statement of the New York Board of Rabbis on the question of religious conversions in prison. "The New York Board of Rabbis has adopted a functional standard for Jewishness within institutional settings. Any person considered Jewish, by reason of birth or conversion, according to the ruling of one of the four major national rabbinic bodies * * * is to be accorded the general services and courtesies extended to Jews.” (Respondents’ answer, exhibit B). That statement also iterated the position of the Board of Rabbis that prison conversions were to be discouraged and ended with the following statement on the question of who is to be considered Jewish. "It is important to stress that any person claiming to be Jewish must present documentation which should be authenticated by the resident Jewish *464 Chaplain.” (Respondents’ answer, exhibit B.) There is no indication petitioner at any time submitted documentation to Rabbi Fine in support of her claim to be a Jew.
Petitioner has every right to hold whatever religious belief may be dictated by her conscience. And to express such belief. She does not have the right to compel the representative of any religion to fully accept her as a member of that faith. This court cannot, will not, nor should it declare anyone to be of one particular faith or another. That determination correctly rests with the representative of the particular faith within his or her learning and knowledge of the principles and teaching of that faith, in accordance with and giving full respect to the tenets of the faith addressed to the question of religious identity. To the extent petitioner seeks a judgment of this court directing respondents to accept and acknowledge her as a person of the Jewish faith, the petition is denied.
This is not to say that a determination by a prison chaplain made within the course of his ministry to an inmate of the State correctional system is not subject to judicial review. Were that individual to act arbitrarily or unlawfully in the exercise of his or her prison chaplaincy, those acts would be subject to review. In the situation of religious identity, if the determination were arbitrarily made, the remedy would be a remand for a de novo nonarbitrary determination by a representative of the religious faith. The remedy would not be a declaration by this court that the individual had a particular religious identity.
There is no proof that Rabbi Fine acted in any way arbitrarily or capriciously in his determination that petitioner is not Jewish. Nor is there anything unlawful in that determination.
Petitioner must appreciate that her right to freely exercise her religious beliefs does not operate in a vacuum. Consideration must also be afforded to the rights of others.
Rabbi Fine made certain determinations and distinctions based on his determination that petitioner is not Jewish. He placed certain restrictions on petitioner’s participation in certain religious observances by those of the Jewish faith at Bedford Hills Correctional Facility. Petitioner was welcome to attend the Friday morning services when the Rabbi was in attendance. However, petitioner was not allowed to attend the Friday evening candle-lighting service; nor was she welcome at a Passover Seder or a Hanukkah meal and celebration.
Respondents include in their answer an October 2, 1996 letter of Rabbi Fine setting forth the reasons for the distinctions *465 he made with regard to petitioner’s participation in the Jewish religious observances at Bedford. The Jewish population at Bedford at any given time is relatively small, and the Rabbi noted only about one half of the Jewish population regularly participated in services. The Rabbi noted a marked increase in the number of non-Jews interested in participating in the Jewish religious observances, resulting in there often being as many non-Jews present as Jews. "This posed a problem, particularly at special holiday programs (such as volunteer visits or festive meals or Friday candle-lighting time) where the number of non-Jews altered the feeling and tone, and the sense of intimacy that comes from a shared background and common rituals was jeopardized. The problem was particularly acute when it came to the regular volunteer visits made by women from the Sisterhood of Bet Torah (a nearby synagogue) as well as the occasional visits by representatives of the Hasidic world.” (Respondents’ answer, exhibit E.) The basis of the Rabbi’s feeling that the tone of the services was altered apparently comes from anecdotal evidence as there is no assertion he was present at those non-Friday morning services.
The determination of whether to allow petitioner to participate in all services or only in some observances and not in others is one that is initially to be made by the chaplain in accord with the advice of the New York Board of Rabbis. "Non-Jews may attend services and they may participate in Bible and related Judaic study groups. It has been the practice that Non-Jews seeking to attend Jewish services or study sessions first obtain approval from their respective chaplains.” (Respondents’ answer, exhibit B.) The Board does not state how that approval is to be exercised. Petitioner has submitted argument in support of the position that the approval should be withheld only for valid penological reasons. "In almost every other institution, anybody in general population can attend whatever religious service they choose. The doors to a religious service should never be closed to anyone. However, the restriction against one being loud, boisterous, disruptive, or in any way endangering the safety or security of the institution would be a valid exercise of the institution’s discretion” (letter of Robert Burns, Aleph Institute Prison Services Coordinator, dated Nov. 7, 1996).
The determination of Rabbi Fine as to the scope of petitioner’s ability to participate in the Jewish religious observances was not made within the private confines of a congregation in our free society. The determination was made within his capac *466 ity as Jewish chaplain at the Bedford Correctional Facility and affected an inmate of the State correctional system. The services supervised by Rabbi Fine are the only services available to an inmate who desires to participate in Jewish religious observances at Bedford. It is doubtful that any other correctional facility where petitioner may be housed has more than one Jewish religious advisor. While the determination of Rabbi Fine as to petitioner’s religious identity is not subject to this court’s review, the limitations placed on the participation of petitioner are subject to review. The question remains whether those limitations impermissibly infringed upon petitioner’s right to freely exercise her religious beliefs.
In addition to the Federal constitutional right to the free exercise of religion, the Constitution of the State of New York strongly guarantees such right. "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state to all mankind” (NY Const, art I, § 3). "This free exercise right has expressly been extended to those incarcerated in New York correctional facilities by section 610 of the Correction Law. In so providing, the Legislature recognized the positive effect that religion can have in rehabilitating convicts and in shaping their behavior while in prison. These provisions of New York law manifest the importance which our State attaches to the free exercise of religious beliefs, a liberty interest which has been called a 'preferred right’ (Matter of Brown v McGinnis, 10 NY2d 531, 536, supra).” (Matter of Rivera v Smith, 63 NY2d 501, 510-511 [1984].) The United States Supreme Court has described the freedom of religion and conscience secured by the Federal Constitution as one of the fundamental preferred freedoms guaranteed by the Constitution. (See, Pierce v La Vallee, 293 F2d 233, 235 [2d Cir 1961], and cases cited therein.) The Appellate Division, Fourth Department, in Matter of Rivera v Smith, recognized that the concern for religious freedom held by the citizens of New York is greater than exists in other jurisdictions. (99 AD2d 672 [4th Dept 1984], affd 63 NY2d 501.)
The provisions of Correction Law § 610 express the Legislature’s application of that fundamental preferred right to prison inmates. "All persons who may have been or may hereafter be committed to or taken charge of by any of the institutions mentioned in this section, are hereby declared to be and entitled to the free exercise and enjoyment of religious profession and worship, without discrimination or preference” (Cor *467 rection Law § 610 [1]). "The rules and regulations established for the government of the institutions mentioned in this section shall recognize the right of the inmates to the free exercise of their religious belief, and to worship God according to the dictates of their consciences * * * in such manner as may best carry into effect the spirit and intent of this section and be consistent with the proper discipline and management of the institution” (Correction Law § 610 [3]). The provisions of Correction Law § 610 and the rules promulgated by the State Commission of Correction, 9 NYCRR part 7024, recognize that the exercise of religious beliefs in a correctional facility necessarily must be subject to regulation to insure the safety, security and good order of the institution and the inmates confined therein: "[F]reedom of exercise of religious worship is not an absolute but rather a preferred right; it 'cannot interfere with the laws which the State enacts for its preservation, safety or welfare’ (People v Sandstrom, 279 N. Y. 523, 530). While freedom to believe is absolute, freedom to act is not. The latter is subject to regulation for the protection of society.” (Matter of Brown v McGinnis, supra, at 536.)
There is a portion of Correction Law § 610 that is directly applicable to the issues in this case. The right of the inmate to participate in religious services, receive spiritual advice and ministration is to be obtained "from some recognized clergyman of the denomination or church which said inmate may respectively prefer or to which they may have belonged prior to their being confined in such institutions” (Correction Law § 610 [3] [emphasis added]). The choice initially is the inmate’s; not the State’s and not that of the representative of the State, whether in a religious capacity or otherwise. While the notation of "Baptist” on the intake forms, or evidence petitioner may have at one point declared herself a Catholic, are relevant to the question of religious identity they are irrelevant to the religious beliefs petitioner desires to practice while in a New York State correctional facility.
Petitioner relies in part on certain State regulations. Those regulations are promulgated by the State Commission of Correction, and consist of certain regulations for the minimum standards for the care, custody, treatment correction and supervision of inmates in correctional facilities under the authority of Correction Law § 45. .The regulations promulgated for county jails and penitentiaries, 9 NYCRR part 7000 et seq., are more extensive than those promulgated for State correctional facilities, 9 NYCRR part 7600 et seq., presumably due to the exis *468 tence of the State Department of Correctional Services. A specific regulation governing religious practices applicable to county facilities has been promulgated (9 NYCRR part 7024). It is that regulation that petitioner refers to in her papers. A comparable regulation was not promulgated for State facilities. Rules of the Commissioner may exist relating to religious practices but neither party has referred this court to such rules.
The rules promulgated for county prisoners take note of the freedom of religious expression protected by our Constitution and Correction Law § 610. It is difficult to conceive that similar rules shouldn’t apply to State prisoners. The statutory authority for such rules exists in Correction Law § 45 (6).
Pursuant to 9 NYCRR 7024.1 (a) and (d), county "Prisoners have an unrestricted right to hold any religious belief and to be a member of any religious group or organization” (9 NYCRR 7024.1 [a]); "Equal status and protection shall be afforded all prisoners in the exercise of their religious beliefs” (9 NYCRR 7024.1 [d]). Even if that regulation were directly applicable to petitioner, it would not vest her with a right to insist that she be considered a member of any religious group. The quoted sections help guarantee an individual’s exercise of her religious beliefs; they prevent the State from recognizing or favoring one religion while withholding recognition or favor from another; they allow an inmate to seek to belong to any religious group, but they do not compel an organization or group to accept every individual who seeks membership. Just as the question of religious identity is one to be made by religious officials and not members of the executive or judicial branches of the government, the decision of who is fully a member of the religious organization is also a determination to be made by religious officials. They are really just two slightly different ways of looking at the same question.
The same answer must be given to petitioner’s interpretation of 9 NYCRR 7024.7, the section governing changes of religion in county correctional facilities. A prisoner cannot be prevented from attempting to change his religious affiliation by the prison authorities but such proposed change is subject to the acceptance of the religious authority; "application to” is not synonymous with "acceptance by”. Any possibility of a prison conversion to Judaism would appear to be very remote. (See, letters from Board of Rabbis and Aleph Institute.)
An incarcerated individual who is not a recognized member of a religious organization, whether such membership is available by birth or conversion, may nevertheless partici *469 pate in the religious services of the faith that she may prefer. (NY Const, art I, § 3; Correction Law § 610.) That right of participation is not absolute but is subject to such reasonable regulation as may be reasonably necessary for the protection of the safety, security and good order of the facility and the health and well-being of all the inmates of the facility. That participation must also be limited to the extent the canons, teachings or precepts of the particular faith reserve participation to recognized members of that faith or preclude nonmembers from active participation in some aspect of a religious observance. There is no assertion that reverent, nondisruptive, presence of a non-Jew at a Jewish religious observance that could occur in the institutional setting would fall into that limited area of exclusion.
The determination of when such restriction is deemed to be necessary is for the religious advisor to make initially. As such restriction necessarily limits the free expression rights of the one restricted, the restriction is subject to review. The history of this case shows that the prison officials defer to the religious advisor on questions such as who shall be placed on the call-out lists. In the exercise of the discretion to place any reasonable and necessary restriction on an inmate’s religious freedom, it is suggested the religious advisor follow the procedure outlined for restrictions placed on an inmate’s rights by the chief administrative officer in a local correctional facility. "Any determination made by the Chief Administrative Officer to limit the exercise of the religious beliefs of any prisoner shall be made in writing and shall state the specific facts and reasons underlying such determination.” (9 NYCRR 7024.11.) A local warden who implemented a chaplain’s decision would have to follow such procedure. Such written determination would allow for meaningful review.
That review would entail the application of a balancing of the competing interests. (See, Matter of Lucas v Scully, 71 NY2d 399, 406 [1988]; Jackson v Coughlin, 204 AD2d 939 [3d Dept 1994]; Matter of Bunny v Coughlin, 187 AD2d 119 [3d Dept 1993].) In the situation, presented by the facts that occurred at Bedford, the balancing would necessarily entail a consideration of the rights of other inmates that might have legitimately played a part in the determination. The personal animosity of a "member” for a "nonmember” would not be a legitimate consideration.
While the State Commission of Correction has not promulgated rules governing religious practices in State facilities, it *470 has published a rule prohibiting discriminatory treatment, including such treatment based on religion (9 NYCRR part 7695). The Department of Correctional Services is required to develop procedures designed to prevent unlawful discrimination. "Each facility shall ensure that inmates are not subject to unlawful discrimination in any facility decision-making process, including but not limited to, selection for educational, religious, vocational or temporary release programs”. (9 NYCRR 7695.4 [a].) To ensure that such unlawful discrimination does not occur, the letter and spirit of NY Constitution, article I, § 3 and Correction Law § 610 should be followed.
As petitioner has been transferred from Bedford, it is not necessary to determine whether the restrictions imposed by Rabbi Fine violated petitioner’s right to religious freedom as guaranteed by the State Constitution and Correction Law § 610.
This court is aware of the decision in Best v Kelly (879 F Supp 305 [WD NY 1995]) where the barring of an individual from Jewish congregate services on the ground that he was not Jewish and was disruptive was held to not violate the individual’s Federal constitutional right to freedom of religion. An individual who "interrupted and challenged points that the Rabbi was trying to teach, saying that the Rabbi was wrong and should follow plaintiff’s interpretations of Jewish Law” (879 F Supp, at 307) clearly is a disruptive influence who could be barred in the interest of institutional order and security. This case is distinguishable from Best in that there is no assertion petitioner was comparatively disruptive. The assertion that she was at the center of inmate quarrels is a different consideration and may or may not warrant a bar dependent on greater development of the facts than occurred herein. Best was also decided under Federal law without reference to NY Constitution, article I, § 3 or Correction Law § 610. While not argued in Best, it is clear the court had doubts as to whether that petitioner held, sincere religious beliefs. As previously noted, there is no question raised as to the sincerity of petitioner’s beliefs. (See also, Nolley v County of Erie, 776 F Supp 715, 741 [WD NY 1991]; and see, Haff v Cooke, 923 F Supp 1104, 1114 [for a discussion of the differing Federal approaches to determining substantial burden questions].)
To the extent the petition seeks a judgment of this court declaring petitioner to be an individual of the Jewish faith and requiring respondents to acknowledge that affiliation, the petition is denied. The petition is granted to the extent petitioner *471 shall be allowed to participate in all Jewish religious observances open and available to any other inmate as guaranteed by NY Constitution, article I, § 3 and Correction Law § 610 subject to any legitimate religious or penological restriction as may be presently appropriate. Any such restriction should be made in writing and should state the specific facts and reasons underlying such determination.